UNITED STATES, Appellee,

v.

**Lawrence M. LANOUE, Defendant, Appellant.**

No. 95–1140.

United States Court of Appeals, First Circuit.

Heard Oct. 2, 1995.

Decided Dec. 15, 1995.

David L. Martin, Providence, RI, for appellant.

Margaret E. Curran, Assistant United States Attorney, with whom Sheldon Whitehouse, United States Attorney, and James H. Leavey, Assistant United States Attorney, Providence, RI, were on brief for appellee.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

BOWNES, Senior Circuit Judge.

Appellant Lawrence M. Lanoue (Lanoue) appeals his convictions and sentence for interstate transportation of a stolen motor vehicle, 18 U.S.C. § 2312 (Count V), interstate transportation of a firearm with an obliterated serial number, 18 U.S.C. § 922(k) (Count VI), and conspiracy to commit federal offenses, 18 U.S.C. § 371 (Count I). Lanoue contends that he is entitled to a new trial on all counts because the trial court abused its discretion by refusing to declare a mistrial when the government cross examined a critical defense witness with Lanoue's own statements which were intercepted in violation of Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–2521 (Title III), and then withheld from him in violation of Fed.R.Crim.P. 16(a)(1)(A). Lanoue also contends that there was insufficient evidence to convict him of Counts I and VI, and that the trial court improperly enhanced his sentence based on conduct of which the jury had acquitted him.

We vacate Counts I and V and remand them for a new trial, affirm Count VI, and order a sentence on Count VI of 60 months imprisonment.

## I. BACKGROUND

### A. Relevant Facts

#### 1. The Government's Case

The government's theory at trial was that Lanoue and his co-defendant Albert Cole (Cole) stole a 1986 Oldsmobile Firenza, and that they and their co-defendant Patrick Meade (Meade) used the car in an attempted robbery of an armored car courier. The government's case consisted primarily of the testimony of fourteen of the approximately fifty FBI agents and Rhode Island State police officers who conducted a massive land and air surveillance of Lanoue and the Oldsmobile and assisted in his arrest.

On December 17, 1993, eight FBI agents attached a tracking device to a 1986 Oldsmobile Firenza located in the lot of American International Leasing in Worcester, Massachusetts. On December 19, 1993, Lanoue and Cole brought the Oldsmobile to a farm in Pascoag, Rhode Island. The farm's owner, Kenneth Gareau (Gareau), was a friend of Cole's who repaired cars. He testified that Cole asked him to repair the front end, that he said he could get to it in a week or so, that it "looked like" Cole took the license plate off the Oldsmobile and put it in the trunk, and that Cole and Lanoue then departed.

American International Leasing reported the Oldsmobile stolen on December 21, 1993. Agents conducting surveillance from an airplane observed Lanoue and Cole return to the farm on the morning of December 23, 1993, and drive the Oldsmobile to the Ames Plaza in Bellingham, Massachusetts, where they met Meade.

While the defendants were parked between a pizza parlor and a liquor store in a lot adjacent to the Ames lot, an unmarked armored car, that appeared to be an ordinary Ford Aerostar van, parked in front of the main entrance to the Ames store. A uniformed courier exited the van and entered the Ames store. Several minutes later, Lanoue and Cole drove from the adjacent lot to the Ames lot and parked. Lanoue was arrested as he walked towards the main entrance of the Ames store. He had a loaded 38 caliber Colt revolver with an obliterated serial number in his waistband. One of the arresting officers testified that Lanoue immediately said: "I am Mitch.[1] You got me. I am gone for life. I have a piece." Another testified that when he asked Lanoue where the other vehicles were, he stated: "You know everything. That's why you're here. I am here alone." Another agent testified that after Lanoue was taken into custody he said, "I wonder who the rat was on this job." And another agent testified that Lanoue said that he would die in prison no matter how long his sentence was because he was 72 years old.

Cole was arrested in the Oldsmobile, which bore a stolen license plate. The ignition was not "popped" and the keys were in it. Meade was arrested in his own car on the other side of the lot with a loaded Smith and Wesson 36 caliber revolver in his pocket.

### 2. The Defendant's Case

Although the law enforcement witnesses did not offer to explain how they came to attach a tracking device to the Oldsmobile and follow its and Lanoue's movements thereafter, cross examination revealed that an informant had provided FBI Agent Brosnan, the case agent, with information that

Lanoue and others planned to steal the car and use it in an armored car robbery.

The defense theory was that the informant was Richard Laraviere (Laraviere), and that the information he provided and upon which the investigation and prosecution rested, was false. According to the defense, Lanoue bought the Oldsmobile from Laraviere, who then falsely informed the FBI that Lanoue was planning to steal the car and use it in an armored car robbery in order to obtain favorable treatment on theft charges pending against him in Massachusetts. The defense suggested that the government was eager to believe Laraviere and assemble a small army to arrest Lanoue because Lanoue had been found not guilty in a case tried by the same prosecutor in 1991. The defense emphasized that the government had not called Laraviere to testify, although he was the only witness who could corroborate its theory that Lanoue stole the Oldsmobile.

Lanoue testified and called Charles Carron (Carron) as a witness to corroborate his own testimony. They both testified in effect as follows. On December 17, 1993, Lanoue was helping Carron remove debris from his house when Laraviere arrived. Laraviere was a millionaire who owned real estate and had once owned a used car dealership. He previously had offered to sell Lanoue a car which Lanoue declined to buy. On this occasion, Lanoue mentioned that he wanted to buy a car for his daughter. Laraviere responded that one of his tenants had abandoned an Oldsmobile that he wanted to sell and said that it was located at American International Leasing in Worcester, which he implied he owned or partially owned. The three drove to American International Leasing, Laraviere obtained the keys from an employee there, and they took the Oldsmobile for a test drive.

Carron testified that upon their return to the lot, he observed Lanoue and Laraviere having a discussion and then saw Lanoue remove money from his wallet and hand it to Laraviere. Lanoue testified that he and Laraviere agreed on a price of $500, that he gave Laraviere a down payment of $200, and that they agreed that Lanoue would pay the

---

1. Lanoue was known as Mitch.

balance and take the car on Sunday, December 19.

Lanoue testified that on December 19, he and Cole drove to American International Leasing in Lanoue's truck, that he paid Laraviere the $300 balance and then drove off in the Oldsmobile with Cole following in the truck. Lanoue testified that as he drove the Oldsmobile back to Rhode Island, he noticed that there was something wrong with the front end. He and Cole therefore took the Oldsmobile to Gareau to be repaired. On December 23, Lanoue and Cole picked up the car on the way to the Ames Plaza where they planned to go Christmas shopping. Lanoue soon found out that Gareau had not worked on the car and took it to another garage, but the person he wanted to look at it was not there. He and Cole then proceeded to the Ames Plaza where they met Meade. As Lanoue walked towards the Ames store where he planned to buy a watch, he was arrested. After Lanoue rested, Cole testified in his own behalf, confirming Lanoue's account of events on December 19 and 23.

Lanoue testified that he carried a gun for protection, explaining that his life had been threatened before and that the police had laughed when he reported it because he had a criminal record. Lanoue acknowledged that he had cleaned the revolver, denied that he had obliterated its serial number, but did not deny that he knew it was obliterated. Lanoue admitted to stating, "I have a piece on me," and that when an agent asked him who was with him he responded that he was alone, meaning that he was alone when he was arrested. He denied making the other statements government witnesses attributed to him.

Lanoue and Carron also gave testimony indicating that Laraviere provided false information in this case in order to gain favorable treatment on pending criminal charges. Carron testified that Laraviere had once stored boating equipment in his garage. When Carron later learned that it was stolen, he reported it to the police, who removed the property and told him that Laraviere had a reputation for claiming that property he had stolen had been stolen by someone else.

Lanoue testified that Laraviere had told him shortly before his own arrest that he had been indicted on fifty-seven counts of theft in Massachusetts, and that he would soon have to begin serving a two-year sentence for those charges pursuant to a plea, unless he could do something to avoid it. To that end, Laraviere offered to pay Lanoue to frame the witness against him in that case. Lanoue testified that he believed Laraviere had not gone to jail because he falsely informed the government that Lanoue planned to steal the Oldsmobile and rob an armored car.

Carron testified that he had visited Lanoue once after his arrest while Lanoue was awaiting trial at the Donald W. Wyatt Detention Center in Central Falls, Rhode Island. Shortly thereafter, two FBI agents and a state police detective visited him, refused to leave his home, subpoenaed him to testify at Lanoue's trial, and threatened that if he did not testify against Lanoue, they would see to it that his pension check and his girlfriend's disability check or her job at the post office were taken away.

## B. Proceedings Below

Lanoue, Cole and Meade were charged in a six-count redacted indictment.[2] All three were charged in Count I with conspiracy to commit federal offenses, 18 U.S.C. § 371; in Count II with conspiracy to interfere with commerce by robbery, Hobbs Act, 18 U.S.C. § 1951; in Count III with attempt to interfere with commerce by robbery, Hobbs Act, 18 U.S.C. § 1951; and in Count IV with using and carrying a firearm during and in relation to an attempt or conspiracy to commit robbery, 18 U.S.C. § 924(c)(1). Count V charged Lanoue and Cole with interstate transportation of a stolen motor vehicle, 18 U.S.C. § 2312, and Count VI charged Lanoue alone with interstate transportation of a firearm with an obliterated serial number, 18 U.S.C. § 922(k). Counts III, IV and V also

2. The grand jury returned the original indictment on January 5, 1994. A redacted indictment was filed when one count was dismissed by the government with leave of court on August 17, 1994.

charged the defendants with aiding and abetting. 18 U.S.C. § 2.

The trial began on October 24, 1994. On November 4, 1994, the jury convicted Lanoue of Counts I, V and VI, acquitted him of all robbery-related charges, and acquitted his co-defendants of all charges. On November 10, 1994, Lanoue moved for judgment of acquittal on Counts I and VI, which was denied on December 19, 1994. On January 13, 1995, the court sentenced Lanoue to 175 months in prison.

## II. DISCUSSION

### A. The Discovery Violation

Lanoue contends that his convictions should be reversed because the prosecutor cross examined Carron with Lanoue's own recorded statements which the government concedes it failed to disclose in violation of Fed.R.Crim.P. 16(a)(1)(A) and the pre-trial discovery order. Rule 16(a)(1)(A) provides in relevant part:

> Upon request of a defendant the government must disclose to the defendant and make available for inspection, copying, or photographing: any relevant ... recorded statements made by the defendant, or copies thereof, within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government....

The trial court's pretrial discovery order required the government to disclose "[a]ny statements of the defendant subject to disclosure pursuant to Rule 16(a)(1)(A)," and "[w]hether the government counsel's file indicates that any wire or oral communications have been intercepted." Lanoue contends that he was incurably prejudiced by the government's use of his statements and that the trial court therefore erred in refusing to declare a mistrial.

#### 1. Cross Examination of Carron with Lanoue's Recorded Statements

Carron's cross examination proceeded in three parts. On Thursday, October 27, the prosecutor opened the first part by accusing Carron of threatening Laraviere:

Sir, didn't the FBI tell you the reason they were at your premises was because you threatened an informant in this case?

Did you ever threaten Mr. Richard Laraviere?

You ever threatened [sic] anyone?

Carron answered "No" to each of these questions. The prosecutor attempted to impeach Carron's denial by asking if Lanoue had told him that Laraviere was the informant in this case, if Lanoue had then demanded that he visit him in prison, and whether he and Lanoue had discussed Laraviere during the visit. Carron confirmed that Lanoue had invited him to visit him in prison in August of 1994 and that he did so, but denied that they had discussed Laraviere. Carron exhibited a poor memory for dates, but otherwise held up well during this part of the cross examination. When Carron stated that he could not swear that he had known Lanoue for fifteen years but was sure he had not known him for thirty years, the prosecutor began reading Lanoue's words from a document while, in the court's words, "brandishing" it at the witness:

Q Did Mr. Lanoue ever tell you that he has known you for thirty years?

A No, he never did.

Q Did Mr. Lanoue ever tell you not to trust the cops. They know who the informant is and that's why he wanted you to go on August the twenty-first to meet him?

A No.

Q He didn't tell you, sir—specifically, on August the 20th of 1994, did Mr. Lanoue say to you, "Let me tell you something. You don't trust the cops. You should know that. We forced it out of them. They got the informant from up north near the Worcester area"?

Mr. Martin: I object.

A I don't remember that.

The court did not sustain the objection, but directed counsel to approach the bench. The prosecutor admitted that he had been reading Lanoue's statements from a transcript of a recorded telephone call that Lanoue had made to Carron from the Wyatt Detention Center while awaiting trial, and that he had

not disclosed it. The court asked the prosecutor whether the document corroborated his questions and he replied that it did. Defense counsel objected to the use of the conversation because the government had withheld it in violation of Fed.R.Crim.P. 16 and the court's pre-trial discovery order, and requested a copy of the transcript and a recess during which he could review it. The prosecutor argued that defense counsel was not entitled to a recess and that he was permitted to use the conversation because Carron had committed perjury, it was retrieved in connection with a separate investigation of witness intimidation, and it was not the fruit of a wiretap. The court directed the prosecutor to continue his cross examination on another subject, did not admonish him, strike the questions or testimony, or give a curative instruction.

Part two of Carron's cross examination proceeded. In contrast to his apparently confident answers in the first part of his cross examination, Carron disavowed any ability to fix a date or time period on any event, expressing concern that the prosecutor was attempting to trap him into committing perjury. He backed away from important parts of his direct testimony, for example, now denying that he had actually seen Lanoue hand Laraviere money after the test drive.

After the court excused the jury for a lunch recess, defense counsel moved for a mistrial, arguing that the prosecutor had violated Fed.R.Crim.P. 16(a)(1)(A) and the pretrial discovery order, that Carron's credibility had been irreparably damaged, and that he had been deprived of the opportunity to prepare Carron with the statement or make an informed decision whether to call him as a witness. The prosecutor argued that he had no obligation to produce the conversation under Fed.R.Crim.P. 16(a)(1)(A) or the pretrial discovery order because it did not become relevant until Carron testified inconsistently with it and it was not a wire intercept. The court ordered an evidentiary hearing for

the following day, and excused the jury until the following Monday.

At the hearing on Friday, October 28, Agent Brosnan, the FBI agent in charge of the case against Lanoue, testified that on August 22, 1994, he requested and received from the Wyatt Detention Center a cassette tape of a conversation between Lanoue and Carron that took place on August 20, 1994, which he had transcribed and provided to the prosecutor. Agent Brosnan testified that, since Lanoue's arrest and indictment and as part of his investigation of the pending case, he had gone to the Wyatt Detention Center and been permitted to listen to various tapes in an effort to hear and obtain recordings of Lanoue's telephone conversations with Carron, but that he found none. In April of 1994, he requested that the facility keep track of all calls made by Lanoue. He was told that it would be done by spot checking, but was not notified of any of Lanoue's calls other than that of August 20.[3]

In the August 20 conversation, Lanoue told Carron that he had discovered during a recent hearing in his case that Laraviere was the source of the government's information. Lanoue did not refer to Lariviere by name but as "your friend, the millionaire," the informant from Worcester, and the only person who could have provided information about the Oldsmobile on December 17. He said that Laraviere had not gone to jail as expected, advised Carron to be careful of Laraviere, and asked Carron to visit him in prison. Lanoue made statements about the Oldsmobile such as, "They know all about the car, they know about everything," "you know I bought that car," and "that car there that I bought at American Motors."

At the conclusion of the evidentiary hearing, the defense again argued for a mistrial. The government conceded that it had violated Fed.R.Crim.P. 16, but argued that the error was made in good faith and that the defense was not prejudiced.

On the following Monday, October 31, the court ruled that the prosecutor's violation of Fed.R.Crim.P. 16(a)(1)(A) did not warrant a

---

**3.** The primary purpose of the hearing was to resolve whether the conversation was intercepted in violation of Title III. Jennifer Egan, Chief of Programs at the Wyatt Detention Center, also testified at the hearing, but only on issues relevant to the defendant's Title III claim.

mistrial or other remedial action. In response to the defendant's request for a curative instruction explicitly referring to the prosecutor's questions of the previous Thursday, the court generally instructed the jury that if counsel's questions "indicate that a particular thing is so, you shouldn't accept that as being established unless and until you hear evidence that the thing is so."

The third part of Carron's cross examination ensued. Contrary to his representation that he would not refer to the conversation again, the prosecutor again asked Carron whether he had had any conversations about Laraviere with Lanoue after Lanoue's arrest. The court overruled the defendant's objection, and Carron again answered that he did not recall. Carron again expressed fear that the prosecutor was trying to make him perjure himself. He refused to answer "yes" or "no" to questions concerning the events he had testified to on direct examination—that Lanoue wished to purchase the car for his daughter, that Laraviere had obtained the keys at the dealership, that they then took the car for a test drive, and that he saw Lanoue give money to Laraviere thereafter—instead answering "evidently," "that was my impression," "I assume so," "I don't recall," and "I don't recall nothing."

### 2. Analysis

■ We review the trial court's handling of the government's discovery violation for abuse of discretion. *United States v. Hodge–Balwing*, 952 F.2d 607, 609 (1st Cir.1991). In order to obtain a reversal on appeal, Lanoue must show that the trial court abused its discretion in ruling on the effect of the discovery violation. *United States v. Tajeddini*, 996 F.2d 1278, 1287 (1st Cir.1993). We will order a new trial if the discovery violation caused prejudice not cured by the trial court's remedy.

The trial court found that no mistrial or other remedy was warranted because: (1) the prosecutor acted in good faith; (2) the purposes of Rule 16 were not subverted by the withholding and use of the undisclosed evidence; and (3) the defendant was not prejudiced. *See United States v. Gladney*, 563 F.2d 491, 494–95 (1st Cir.1977).

### a. Did the prosecutor act in good faith?

■ The court found that the prosecutor had made a good faith error in judgment. Such a finding depends in large measure on whether the prosecutor's explanation was credible and is therefore entitled to considerable deference. *United States v. Levy–Cordero*, 67 F.3d 1002, 1013 (1st Cir.1995). In this case, the prosecutor's explanations for withholding the statement were both factual and legal. To the extent the court relied on the reasonableness of the prosecutor's legal arguments, we temper the usual deference accorded purely factual findings. *Cf. RCI Northeast Servs. Div. v. Boston Edison Co.*, 822 F.2d 199, 203 (1st Cir.1987) ("a finding of fact predicated upon, or induced by, a misapprehension of law is robbed of its customary vitality"). We conclude that the trial court's finding of good faith was not supported by the facts or the law.

First, the court gave weight to the fact that the government had not received the statement until two months prior to trial. But because the government's obligation to disclose the defendant's recorded statements is a continuing one, Fed.R.Crim.P. 16(c), that was a factor militating against rather than in favor of a finding of good faith. *Cf. Tajeddini*, 996 F.2d at 1287 (no bad faith where prosecutor was unaware of defendant's statement until the day before he disclosed it to defense counsel three days before trial). Instead of disclosing the statement as soon as he received it from Agent Brosnan, two months prior to trial, the prosecutor never disclosed it at any time before using it before the jury.

Second, the court thought that there was a "colorable question" as to whether the statement had to be produced because it was a "mixed statement" by the defendant and a potential witness, so that the government only had an obligation to produce the statement "to the extent it was a statement of Mr. Lanoue." But this theory, even if "colorable," does not explain the prosecutor's actions. "[S]tatements discovered by means of electronic surveillance" are within Rule 16(a)(1)(A). Fed.R.Crim.P. 16 advisory committee's note. And the rule contains no ex-

ception for a defendant's recorded statements on the basis that they comprise one side of a conversation. The court's pre-trial order required disclosure of any statements subject to disclosure under Rule 16 and "[w]hether the government counsel's file indicates that any wire or oral communications have been intercepted." Whether or not Carron's side of the conversation was required to be disclosed under Rule 16, the transcript in its entirety should have been disclosed for purposes of determining its admissibility before trial. *See United States v. Latham,* 874 F.2d 852, 864 (1st Cir.1989) (it was error for the government not to have provided defendant with tape recordings containing conversations between defendant and government witnesses). If the prosecutor genuinely believed that Carron's side of the conversation was not discoverable, the reasonable and only permissible course would have been to seek redaction of Carron's words.[4] *See* Fed.R.Crim.P. 16(d)(1). Because Rule 16 could not reasonably be read to allow the government to withhold Lanoue's side of the conversation, the "mixed statement" rationale did not support a finding of good faith.

Third, the court found that the prosecutor genuinely believed that the statement was not relevant within the meaning of Rule 16. The statement was relevant if it had "any tendency to make the existence of any fact that [was] of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Relevance is to be interpreted broadly in the context of Rule 16(a)(1)(A). *See* Fed.R.Crim.P. 16 advisory committee's note (rejecting narrow interpretation of defendant's right to discover own statements). The rule gives a "defendant virtually an absolute right" to his own recorded statements "in the absence of highly unusual circumstances that would otherwise justify a protective order." 2 C. Wright, *Federal Practice and Procedure* § 253, at

46–47 (1982) (internal citations and quotation marks omitted). *See also United States v. Bailleaux,* 685 F.2d 1105, 1114 (9th Cir.1982) (adopting broad interpretation of relevance as applied to defendant's statements as a matter of practicality); *United States v. Haldeman,* 559 F.2d 31, 74 n. 80 (D.C.Cir. 1976) (en banc) (disclosure of defendant's statements is "practically a matter of right even without a showing of materiality"), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

The statement obviously was relevant. Lanoue made statements about the Oldsmobile that were arguably both inculpatory and exculpatory.[5] He discussed the informant, who was a potential government witness, and made statements relevant to the defense theory that the government's case rested on false information provided by that informant. *See United States v. Noriega,* 764 F.Supp. 1480, 1494 (S.D.Fla.1991) (conversations of defendant recorded in prison about potential government witnesses were relevant within the meaning of Rule 16(a)). Even assuming that the government could not envision the statement's relevance before trial, it certainly understood its relevance when defense counsel outlined the defense theory in his opening statement.

The reasons proffered by the prosecutor in support of his belief that the statement was not relevant—that it was obtained in a separate investigation of alleged witness intimidation, that the conversation did not become relevant until Carron testified inconsistently with it, and that he did not expect Carron to testify about Laraviere—were without basis in fact or law.

Rule 16(a)(1)(A) contains no exception for a defendant's recorded statements if they are obtained in connection with a separate investigation, so long as they are relevant to the pending case. "[A]cceptance of the language for just what it says is dictated by the funda-

**4.** Nothing precluded disclosure of Carron's side of the conversation. He was not a government witness, 18 U.S.C. § 3500(a), and his side of the conversation was not grand jury testimony. *United States v. McMahon,* 938 F.2d 1501, 1504–05 (1st Cir.1991) (explaining rule that defense is not entitled to the grand jury testimony of a

defense witness until after cross examination as being based on the need for grand jury secrecy).

**5.** On appeal, Lanoue does not press his contention at trial that the conversation was required to be disclosed as exculpatory evidence.

mental fairness of granting the accused equal access to his own words, no matter how the government came by them." *United States v. Caldwell*, 543 F.2d 1333, 1353 (D.C.Cir. 1974), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). Moreover, it appears that Agent Brosnan obtained the conversation in connection with his investigation of the pending case. For at least six months prior to trial, he had been attempting to obtain telephone conversations between Lanoue and Carron as part of his investigation of the case pending against Lanoue. The prosecutor stated that he knew about and approved that activity, and that immediately after obtaining the August 20 conversation, he subpoenaed Carron to testify against Lanoue in the pending case. It is therefore difficult to credit the "separate investigation" rationale. In any event, the conversation contained Lanoue's statements that were relevant to the charges pending against him and his defense to those charges. Those statements therefore were required to be disclosed by the plain terms of Rule 16.

As to the prosecutor's contention that the conversation did not become relevant until Carron testified inconsistently with it, the government's duty to disclose a defendant's relevant recorded statements does not hinge on whether or when the government uses the statement. Only an oral statement to a known government agent is required to be disclosed "if the government intends to use that statement at trial." Fed.R.Crim.P. 16(a)(1)(A). But even that type of statement is required to be disclosed regardless of whether the government intends to introduce it in its case-in-chief, use it for impeachment, or introduce it in rebuttal. *See* Fed. R.Crim.P. 16 advisory committee's note to 1991 amendment. Rule 16(a)(1)(A) is unequivocal that the government "must disclose ... any relevant ... recorded statements made by the defendant." Even an illegally obtained inconsistent statement of a defendant that can only be used to impeach him (but not a defense witness), *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *James v. Illinois*, 493 U.S. 307, 313, 110 S.Ct. 648, 652, 107 L.Ed.2d 676 (1990), must be produced to him under Fed. R.Crim.P. 16(a)(1)(A). *See, e.g., United States v. Lewis*, 511 F.2d 798 (D.C.Cir.1975). The government's theory that Lanoue's statements were not relevant until a witness testified inconsistently with some part of the conversation was therefore erroneous, particularly where Carron was not cross examined about his own statements, but about Lanoue's. *See United States v. Scafe*, 822 F.2d 928, 935 (10th Cir.1987) (government violated Rule 16 by withholding defendant's letters and using them to cross examine defense witness).

The prosecutor's representations that he did not expect Carron to testify until the day before he testified, and that even then he did not expect Carron to testify about Laraviere's character, were irrelevant because, as explained, Rule 16(a)(1)(A) requires the government to disclose the defendant's recorded statements regardless of whether or when it intends to use them. Moreover, it is difficult to credit the government's representation. The recorded conversation itself and defense counsel's opening statement put the government on notice that Carron would testify about Laraviere.

Finally, the court noted that, although the prosecutor could have tried to conceal the violation, he did not. It is true that the prosecutor immediately admitted that he held a transcript of the defendant's recorded conversation in his hand and that he had not disclosed it, and conceded the next day, with a myriad of excuses, that he had violated Rule 16. We will not overlook a prosecutor's failure to know or follow the discovery rules on the basis that he did not try to hide the violation.

In any event, whether the prosecutor withheld the defendant's statements in good faith or intentionally has little to do with whether the court should have declared a mistrial, since prosecutorial good faith could have no mitigating effect on the prejudice flowing from the violation. *See United States v. Padrone*, 406 F.2d 560 (2d Cir.1969) (granting new trial where inadvertent non-disclosure of defendant's statement affected trial strategy).

### b. Were the purposes of Rule 16 subverted?

■ Rule 16's mandatory discovery provisions were designed to contribute to the fair and efficient administration of justice by providing the defendant with sufficient information upon which to base an informed plea and litigation strategy; by facilitating the raising of objections to admissibility prior to trial; by minimizing the undesirable effect of surprise at trial; and by contributing to the accuracy of the fact-finding process. *See United States v. Alvarez,* 987 F.2d 77, 84–86 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 147, 126 L.Ed.2d 109 (1993); Fed. R.Crim.P. 16 advisory committee's note. The trial court found that the government's discovery violation had not undermined the purposes of Rule 16 because it did not cause the defendant to unknowingly subject himself to impeachment;[6] Rule 16 was not intended to protect against surprising a witness with an inconsistent statement; and it may have actually assisted the accuracy of the fact-finding process by surprising the witness.

All of these reasons miss the point because the government cross examined Carron by referring to and reading Lanoue's, and not Carron's, words. Lanoue had a right under the Federal Rules of Criminal Procedure to discover his recorded statements and to prepare for trial and devise a defense strategy based on the evidence disclosed. *Alvarez,* 987 F.2d at 85. The court's reasoning that surprising a witness with the defendant's statements promoted accuracy and therefore militated against remedial action turns Rule 16 on its head. Due to the nondisclosure, the defense was deprived of the opportunity to refresh Carron's recollection and to investigate the circumstances surrounding the conversation. This unfairly surprised the defense and deprived it of the opportunity to design an intelligent litigation strategy that responded to the statement.

We also note that it is far from clear that the cross examination assisted the accuracy of the trial. The government opened its cross examination by accusing Carron of threatening Laraviere. At sidebar the prosecutor stated that Carron had threatened Laraviere, but proffered nothing to support the accusation other than to say that the document from which he read corroborated his questions. The conversation contained no mention of threats. In it, Lanoue told Carron that Laraviere was the informant, that his lawyer was putting an investigator on Laraviere, that he should not warn Laraviere, and that he should be wary of Laraviere. We doubt that this was a sufficient basis for asking Carron whether he had threatened Laraviere, and it plainly was an insufficient basis for asking if he had ever threatened anyone. *Cf. United States v. Lilly,* 983 F.2d 300, 306 (1st Cir.1992) (prosecutor's explanation for asking question was plausible where he had in hand a judicial opinion finding appellant was not a credible witness); *United States v. Gomez–Pabon,* 911 F.2d 847, 857 n. 5 (1st Cir.1990) (expressing doubt that prosecutor's questions to defense witness about whether he was under investigation for drug smuggling were improper since the prosecutor volunteered to call witnesses to attest to the foundation of the questions), *cert. denied,* 498 U.S. 1074, 111 S.Ct. 801, 112 L.Ed.2d 862 (1991); *United States v. Madrid Ramirez,* 535 F.2d 125, 129 (1st Cir.1976) (appellant not prejudiced by question to defense witness about prior offense because it was based on an actual conviction). Carron apparently was not charged with threatening Laraviere. The government did not present evidence in its rebuttal case to refute Carron's description of the FBI agents' visit in which he said that the agents pressured him to testify against Lanoue, not that they accused him of threatening Laraviere. The government was free to show through admissible evidence that its informant had been threatened, but it offered no such evidence. Nonetheless, the jury may well have received the impression from the prosecutor's improper questions that Laraviere did not testify because Carron had threatened him. If Lanoue's counsel had been able to refresh Carron's recollection with the transcript of the conversation, the jury would have been warranted in reaching the conclusion that Laraviere did not testify

---

**6.** Lanoue testified after Carron, and therefore after the discovery violation came to light.

because his testimony would not have helped the government.

The prosecutor's failure to disclose the conversation at any time before using it also subverted Rule 16's purpose of facilitating the fair and efficient pre-trial determination of the admissibility of Lanoue's statements. Although an evidentiary hearing was held, it was not until after the prosecutor had already used the statements before the jury. Moreover, we think the hearing was unfairly truncated due to the government's late disclosure. After Agent Brosnan testified, defense counsel attempted to obtain the presence of the Wyatt Detention Center employee who provided Agent Brosnan with the conversation in order to explore whether it was intercepted as a result of monitoring directed specifically against Lanoue, which was relevant to its admissibility under Title III. Ms. Egan, Director of Programs at the facility, responded that the employee would not attend the hearing because it was his day off. The court refused the defendant's request for a recess during which the prosecutor could convince Ms. Egan of the importance of the employee's attendance. If the conversation had been disclosed two months prior to trial when it should have been, defense counsel could have obtained any necessary witnesses. The incomplete mid-trial hearing necessitated by the prosecutor's failure to disclose was neither fair nor efficient.

### c. Was Lanoue prejudiced?

The court found that Lanoue had not been prejudiced for the following reasons: although the government had done an effective job of impeaching Carron, the statement played little role in that process because it was peripheral to Carron's testimony and the defense theory; Carron denied that Lanoue made the statements; and the statements had not been introduced into evidence.

The improper questions based on Lanoue's statements were not peripheral to Carron's testimony and the defense. At the close of the government's case-in-chief, the evidence concerning the stolen vehicle charge was that the Oldsmobile was reported stolen on December 21 and that Lanoue was driving it on December 19 and again on December 23.

The defense, consisting of Lanoue's and Carron's testimony, was that Lanoue had purchased the car from Laraviere, who had represented that the car was his to sell and then falsely informed the FBI that Lanoue was planning to steal the car in order to obtain favorable treatment on pending theft charges. If the jury believed that testimony, it would have had grounds for acquitting Lanoue of the stolen vehicle charge.

A key element of the defense, argued in both opening and closing, was that the informant upon whose information the government's entire case rested did not testify at trial. Indeed, the government clearly recognized that Laraviere's absence and the implication that he had provided false information could defeat its case. The government objected when the defense attempted to elicit the informant's name and the exact information he had provided, and urged the jury in closing argument to ignore Laraviere's absence. Yet it offered no evidence to explain his absence, other than the improper questions accusing Carron of threatening Laraviere and insinuating that the threat stemmed from a conversation with Lanoue. As the government intended, these questions had a detrimental effect on a defense that was otherwise uncontradicted. *Cf. United States v. Lewis*, 40 F.3d 1325, 1340 (1st Cir.1994) (no prejudice to the defense due to government's delayed fingerprint analysis because there was ample evidence to refute and none to support the defendant's theory that he was framed).

Lanoue also was prejudiced because the failure to disclose his statements deprived him of the opportunity to effectively prepare for trial and to design an intelligent trial strategy. *See Alvarez*, 987 F.2d at 85; *United States v. Hemmer*, 729 F.2d 10, 13 (1st Cir.), *cert. denied*, 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984); *Gladney*, 563 F.2d at 494. If the conversation had been disclosed two months before trial as it should have been, Lanoue would have known that Agent Brosnan obtained it in connection with a "separate investigation of witness intimidation." Lanoue's counsel would then have been able to investigate whether there was such an investigation and, if so, what came of

it, enabling him to either prepare Carron for cross examination on that subject or make an intelligent decision not to call him as a witness.

Carron's denial that Lanoue made the statements militates in favor of rather than against a finding of prejudice because defense counsel was deprived of the opportunity to refresh Carron's recollection about the content of the conversation. *See United States v. Rodriguez,* 799 F.2d 649, 654 (11th Cir.1986) (defendant's denial of the existence of undisclosed items bolstered rather than weakened his claim for a mistrial because it deprived him of the opportunity to support the denial or refresh his recollection, thus defeating purposes of the discovery requirement). Carron answered "no," and then finally "I don't remember that" to questions asking him if Lanoue had made statements about Laraviere, while the prosecutor referred to, read from, and brandished a document obviously containing those statements. The defense should have been able to refresh Carron's recollection about what Lanoue said to him.

Furthermore, Carron was thoroughly unnerved by the prosecutor's use of specific dates while referring to the transcribed conversation. To be sure, he was uncertain about specific dates and time frames throughout his testimony. This may or may not have detracted from his overall credibility but when the prosecutor began to brandish the transcript, it received a major blow. Thereafter, Carron refused to directly answer any question concerning dates, and eventually any question at all, expressing fear of being trapped into committing perjury. If defense counsel had had access to the transcript, he could have attempted to refresh Carron's recollection. Failing that, he could have decided not to call Carron as a witness at all. Instead, the government was able to destroy, with the defendant's own statements, the credibility of the only defense witness who testified to the defense theory other than the defendant himself.

■ That the statement was not actually introduced in evidence does not show lack of prejudice. An improper question alone can require a mistrial or other potent remedy if it causes prejudice. *See Rodriguez,* 799 F.2d at 654 (district court erred in denying mistrial on the basis that the undisclosed material was not introduced into evidence where the government's use of the material in questioning defendant was just as effective as if it had been introduced); *Padrone,* 406 F.2d at 560 (although undisclosed statement was not introduced, district court erred in failing to grant mistrial where defendant's direct testimony was inconsistent with the statement). Here, the government's failure to disclose the conversation and its questions based on the conversation could well have led to the destruction of Carron's credibility and undermined the defense theory. That the conversation was not introduced in evidence did not erase or mitigate the prejudice.

### d. Did the trial court take appropriate action to cure and prevent prejudice?

■ When a party fails to comply with Fed.R.Crim.P. 16, the court is empowered to order that party to comply with the rule, grant a continuance, exclude the evidence, or enter other just relief. Fed.R.Crim.P. 16(d)(2). What remedy should be applied depends on the "seriousness of the violation and the amount of prejudice to the defendant." *Gladney,* 563 F.2d at 494. Here, the violation was serious and likely to have caused serious prejudice. Because the statement was not disclosed at any time before the government used it, or in enough time that the defense could make use of it, a mistrial was the only appropriate remedy. We do not decide whether the court would have acted within its discretion if it had taken more forceful measures than it did, but we note that the court could have stricken the questions, given an immediate and explicit curative instruction, granted the defendant's request for a recess, and even halted the cross examination and then allowed redirect.

Moreover, the court did not act to prevent further prejudice. Although the prosecutor had represented that he would not refer to the conversation again, he reminded the jury of the statements he had read four days earlier by asking Carron whether he had had

any conversations about Laraviere with the defendant after the defendant's arrest. Defense counsel's objection was overruled, and Carron again answered that he did not recall. By overruling the objection, the court tacitly approved the improper question in the jury's presence. *See United States v. Manning*, 23 F.3d 570, 575 (1st Cir.1994).

The government argues on appeal that the trial court did not abuse its discretion because it eventually gave Lanoue's counsel the opportunity to review the statement with Carron to determine whether he wished to recall him. The court ignored defense counsel's immediate request for a recess and to be given the statement. The court denied his request for a recess at the conclusion of Carron's cross examination so that he could prepare him for redirect. Instead, the court permitted Lanoue's counsel to meet with Carron for the first time during a later recess in the middle of Lanoue's direct testimony, ruling that he could recall Carron to the witness stand if his reasons for doing so were sufficient.

This is not a case of merely delayed disclosure where "the critical inquiry is ... whether the tardiness prevented defense counsel from employing the material to good effect." *United States v. Osorio*, 929 F.2d 753, 757 (1st Cir.1991). The government's use of the conversation without disclosing it at all precluded Lanoue's counsel from using it to any effect. When he twice requested a recess in an attempt to mitigate the harm already done, those requests were denied. *Cf. Hodge–Balwing*, 952 F.2d at 609 (defendant failed to show prejudice where court ordered the government to hand over the case report before the witness testified and defendant failed to seek a continuance); *Hemmer*, 729 F.2d at 13 (defendants failed to show prejudice where they received reports, used them in their defense, and failed to seek a continuance). We do not fault Lanoue's counsel for declining to recall Carron at a point when he was in shambles as a witness as the result of the government's violation of the rules and the trial court's utter failure to send a message to the witness, the jury or counsel that the government's questions were improper.

Count V is vacated and remanded for a new trial because Lanoue plainly was prejudiced in defending against the stolen motor vehicle charge. There was no prejudice with respect to Count VI because Carron's testimony did not touch on whether Lanoue knowingly transported a firearm with an obliterated serial number.

Although it is a more difficult question, we believe that Lanoue also suffered prejudice as to Count I, the conspiracy count. The jury was instructed that it could convict Lanoue of conspiracy if it found he conspired to commit any one or more of six object offenses: (1) interstate transportation of a stolen motor vehicle, 18 U.S.C. § 2312; (2) possession of a stolen motor vehicle that had crossed state boundaries, 18 U.S.C. § 2313; (3) interstate transportation of a firearm by a convicted felon, 18 U.S.C. § 922(g)(1); (4) using or carrying a firearm during and in relation to an attempt or conspiracy to commit robbery, 18 U.S.C. § 924(c)(1); (5) interstate possession of a stolen firearm (referring to Meade's revolver), 18 U.S.C. § 922(j); or (6) interstate transportation of a firearm with an obliterated serial number (referring to Lanoue's revolver), 18 U.S.C. § 922(k). The object offenses best supported by the evidence were the two relating to the stolen Oldsmobile, with respect to which Lanoue was prejudiced. Unless we can conclude with fair assurance that the jury relied on one of the other four objects, we must reverse the conspiracy conviction. *Cf. United States v. Morrow*, 39 F.3d 1228, 1236 (1st Cir.1994) (erroneously admitted evidence was harmless where it was used to prove an object of the conspiracy to which defendant was never tied and it was a "virtual certainty" that jury convicted him for his involvement in the other object offense), *cert. denied*, —— U.S. ——, 115 S.Ct. 1328, 131 L.Ed.2d 208 (1995).

The evidence of a conspiracy to commit any of the latter four object offenses was not overwhelming, and the jury's verdicts give us little confidence that it relied on any of them to find Lanoue guilty of conspiracy. The jury necessarily rejected all of them as objects of an agreement by Cole or Meade when it acquitted them of Count I. Although

we could not conclude from this that there was insufficient evidence of a conspiracy, *United States v. Bucuvalas,* 909 F.2d 593, 597 (1st Cir.1990), the question we address here is not what a rational jury could conclude but "rather what effect the error had or reasonably may be taken to have had upon the jury's decision" in this case. *Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946).

The fourth object offense, using or carrying a firearm during and in relation to a crime of violence, was charged as a substantive offense in Count IV. The court instructed the jury that it could find a defendant guilty of Count IV if it found that he (1) committed either the Hobbs Act attempted robbery or the Hobbs Act conspiracy to commit robbery, and (2) knowingly used or carried a firearm during or in relation to that crime or those crimes; or if it found that he aided and abetted that offense. The jury found all three defendants not guilty of using or carrying a firearm during and in relation to an attempt or conspiracy to commit robbery, and of aiding and abetting that offense; not guilty of Count II, the Hobbs Act conspiracy; and not guilty of Count III, the Hobbs Act attempt, and of aiding and abetting that offense. Under these circumstances, we think that the jury necessarily rejected, as an object of the Count I conspiracy, using or carrying a firearm during and in relation to an attempt or conspiracy to commit robbery.[7]

The third and fifth object offenses, interstate transportation of a firearm by a convicted felon (Lanoue), and interstate possession of a stolen firearm (Meade's), were not charged as substantive offenses against any of the defendants. The sixth, interstate transportation of Lanoue's firearm with an obliterated serial number, was charged as a substantive offense in Count VI against Lanoue alone, and the jury found him guilty of

it, but there was no evidence that any coconspirator knew that the serial number was obliterated.[8] Given the dearth of evidence that Lanoue conspired with anyone else who possessed the requisite knowledge and intent to commit these offenses, and the fact that the jury rejected each of them as a basis for a conspiracy conviction against Cole and Meade, we think that the likelihood is remote that the jury found that Lanoue conspired with anyone else to commit them.

The object offenses best supported by the evidence were the two relating to the stolen car. From what we can glean of the jury's reasoning in this case, it is likely they either rejected the other object offenses, or found a conspiracy to transport a stolen car and did not attempt to reach agreement on the other object offenses. We cannot conclude that the erroneous use of Lanoue's statements did not substantially sway the jury's conspiracy verdict, *Kotteakos,* 328 U.S. at 765, 66 S.Ct. at 1248, and therefore vacate and remand Count I for a new trial.

### B. Title III

■■■ Lanoue objected to use of the conversation at trial and seeks reversal on appeal on the additional ground that it was intercepted in violation of Title III. Title III prohibits, subject to certain exceptions, the interception of telephone conversations in the absence of a court order. *See* 18 U.S.C. §§ 2511(1), 2516. Neither the contents of an intercepted telephone conversation nor any evidence derived therefrom may be received in evidence, or used to impeach a witness, if disclosure of that information would violate Title III. 18 U.S.C. § 2515. Title III's protections extend to prisoners' conversations over institutional telephones. *See, e.g., Campiti v. Walonis,* 611 F.2d 387 (1st Cir. 1979); *United States v. Amen,* 831 F.2d 373, 378 (2d Cir.1987), *cert. denied,* 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988). Its

---

7. Because the jury expressly acquitted Lanoue of violating 18 U.S.C. § 924(c)(1), and necessarily rejected that offense as an object of the Count I conspiracy, the Supreme Court's recent definition of the "use" element of a violation of 18 U.S.C. § 924(c)(1), *Bailey v. United States,* ——U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), is not implicated.

8. Indeed, the government does not argue on appeal that there was sufficient evidence to support a conspiracy to possess Meade's stolen firearm or Lanoue's firearm with an obliterated serial number.

prohibitions would not apply in this case if a party to the conversation gave prior consent to the interception, 18 U.S.C. § 2511(2)(c), or if the conversation was intercepted "by an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a)(ii).

After an evidentiary hearing, the trial court ruled that the interception and use of Lanoue's conversation did not violate Title III because he impliedly consented to the interception.[9] We need not decide this issue because we vacate the convictions on Counts I and V on the basis of Rule 16. Moreover, because the factual record is undeveloped in important respects, and the parties have not briefed or argued certain relevant issues on appeal, we cannot decide whether the conversation may be used at a new trial. But because we are sufficiently concerned about whether the Wyatt Detention Center intercepted Lanoue's conversation in compliance with Title III, we offer the following guidance to the judge presiding over the new trial.

 The record reveals that the Wyatt Detention Center is owned and operated by Cornell Cox Management, a private corporation. Pursuant to an agreement with the United States Marshal's office, it houses federal prisoners awaiting trial. Neither the record facts nor the parties' briefs disclose what regulations applied to or were followed by the Wyatt Detention Center, but federal regulations require federal prisons to establish procedures for monitoring inmate telephone calls and to notify inmates of the monitoring policy. 28 C.F.R. § 540.102 (1995). The Federal Bureau of Prisons requires notice to be posted at all monitored telephones "advis[ing] the user that all conversations from that telephone are subject to monitoring and that use of the telephone constitutes consent to this monitoring," and requires each inmate to sign an acknowledgement form stating the same. Federal Bureau of Prisons Program Statement 5264.05 ¶ 6 (April 25, 1994). Consent has been held properly to have been implied when notice was given according to these standards. See, e.g., Amen, 831 F.2d at 379. The record

indicates that Lanoue did not receive notice even approaching these standards. Deficient notice will almost always defeat a claim of implied consent. See Williams v. Poulos, 11 F.3d 271, 282 (1st Cir.1993); Campiti, 611 F.2d at 390, 393. Keeping in mind that implied consent is not constructive consent but "'consent in fact,'" consent might be implied in spite of deficient notice, but only in a rare case where the court can conclude with assurance "'from surrounding circumstances ... that the [party] knowingly agreed to the surveillance.'" Griggs–Ryan v. Smith, 904 F.2d 112, 116–17 (1st Cir.1990) (quoting Amen, 831 F.2d at 378) (emphasis supplied). We emphasize that "consent should not casually be inferred," Griggs–Ryan, 904 F.2d at 117, particularly in a case of deficient notice. The surrounding circumstances must convincingly show that the party knew about and consented to the interception in spite of the lack of formal notice or deficient formal notice.

The trial court did not rely on the law enforcement exception because the government offered no evidence or legal authority to show that the employees of the Wyatt Detention Center who intercepted Lanoue's conversation were "officer[s] of the United States or of a State or political subdivision thereof ... empowered by law to conduct investigations of or make arrests for offenses enumerated in [section 2516]." 18 U.S.C. § 2510(7). If the government can establish that the employees who intercepted Lanoue's conversation had the requisite status and powers by law, they must also have been acting in the ordinary course of duty when they did so.

The conversation was intercepted when it was heard by someone other than Lanoue and Carron, whether by listening as the conversation took place or by tape recording and listening thereafter. See Deal v. Spears, 980 F.2d 1153, 1158 (8th Cir.1992); George v. Carusone, 849 F.Supp. 159, 163 (D.Conn. 1994). In Campiti, we held that the ordinary course of duties exception did not apply where the interception was done outside the usual routine and without notice, was focused

---

9. The government did not contend that Carron consented to the interception.

on Campiti, and was not reasonably related to maintaining security at Walpole. 611 F.2d at 390, 392.[10] As noted previously, the employee who located the conversation and provided it to Agent Brosnan did not testify at the hearing. If the call was intercepted to gather evidence for Agent Brosnan's investigation, rather than for prison security purposes, it was not done in the ordinary course of duty.

If neither exception applies, the conversation may not be offered in evidence or used to impeach any witness other than Lanoue. According to the "impeachment" exception allowing use of illegally intercepted communications to impeach a testifying defendant (but not a witness), Lanoue's statements in the conversation may be used for the limited purpose of impeaching him on matters plainly within the scope of his direct examination. *Williams*, 11 F.3d at 287 & n. 35.

## C. Sufficiency of the Evidence

■ Lanoue argues on appeal, as he did in his motion for judgment of acquittal, that the evidence adduced at trial was insufficient for the jury to have convicted him of conspiracy (Count I) or interstate transportation of a firearm with an obliterated serial number (Count VI). In assessing a claim of insufficiency of the evidence, we examine the record in the light most favorable to the verdict, drawing all reasonable inferences and credibility determinations in its favor, in an effort to ascertain whether the proof would have allowed a rational jury to find the defendant guilty beyond a reasonable doubt. *See United States v. Valerio*, 48 F.3d 58, 63 (1st Cir.1995).

### 1. Count I—Conspiracy

■ Lanoue argues that no rational jury could conclude beyond a reasonable doubt

that he conspired with anyone else who possessed the requisite criminal intent, especially because his co-defendants were acquitted. The government argues that there was sufficient evidence from which the jury could conclude that Lanoue conspired with Cole. The government correctly argues that we cannot assume that the acquittal of Lanoue's co-defendants reflects a failure of proof rather than leniency or compromise, *Bucuvalas*, 909 F.2d at 597, and Lanoue is correct that if we find the evidence of conspiracy insufficient against the alleged co-conspirators, the evidence against him also would be insufficient. *Id.* at 596.

Our review of the record persuades us that the trial court correctly ruled that there was sufficient evidence from which the jury could conclude beyond a reasonable doubt that Lanoue conspired with Cole to transport a stolen automobile in interstate commerce and to possess a stolen automobile that had crossed a state boundary.[11] The Oldsmobile was reported stolen on December 21. Lanoue and Cole took it from Massachusetts to Rhode Island on December 19, and from Rhode Island to Massachusetts on December 23. The jury was free to reject Lanoue's and Carron's testimony that Lanoue purchased the car from Laraviere after Lariviere represented that the car was his to sell. Because we hold that the government's surprise use of the recorded conversation erroneously interfered with that credibility determination, Count I is required to be vacated. Nonetheless, because the evidence was sufficient, a new trial is not precluded. Having found sufficient evidence of a conspiracy to transport and possess a stolen car, we need not decide whether there was sufficient evidence of a conspiracy to commit any other object offense. *See Griffin v. United States*, 502 U.S. 46, 56–57, 112 S.Ct. 466, 472–73, 116

---

10. Again, the record does not disclose what regulations applied to or were followed by the Wyatt Detention Center, but federal regulations state that the purpose of inmate telephone monitoring is "to preserve the security and orderly management of the institution and to protect the public." 28 C.F.R. § 540.102. "Requests for information (e.g., subpoenas) on monitored calls are to be directed to the Regional Counsel." Federal Bureau of Prisons Program Statement 5264.05 ¶ 6 (April 25, 1994).

11. We conclude, however, that the trial court was incorrect in finding, alternatively, that there was sufficient evidence that Lanoue conspired with Laraviere to transport a stolen automobile in interstate commerce. The government adduced no evidence and did not argue that Lanoue conspired with Laraviere.

L.Ed.2d 371 (1991) (guilty verdict on multiple object conspiracy stands in the face of a claim of insufficiency of the evidence as to one of the objects as long as the evidence sufficiently supported an alternative object).

### 2. Count VI—Interstate Transportation of a Firearm with an Obliterated Serial Number

■ Lanoue was arrested with a Colt 38 caliber Police Special revolver with an obliterated serial number tucked in his waistband. He argues there was insufficient evidence that he knew the serial number was obliterated, an essential element of a violation of 18 U.S.C. § 922(k). *United States v. De Leon Ruiz*, 47 F.3d 452, 454 (1st Cir. 1995). Viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences and credibility judgments in its favor, we conclude that there was sufficient evidence from which a rational jury could conclude that Lanoue knew the serial number was obliterated. Lanoue testified that he carried the revolver fairly often to protect himself, and acknowledged that he had cleaned the gun. When the prosecutor showed him the gun and asked him if it was the gun he carried, Lanoue replied, "Is the State Police on top of the barrel. On top of the barrel ... That's the one." He denied that he had obliterated the serial number, but when asked if he knew it was obliterated, Lanoue answered, "I never checked it, it's possible. But I never—it doesn't make no difference to me whether they wiped out or not. I don't know anything about them anyway much." Under these circumstances, a rational jury could conclude beyond a reasonable doubt that Lanoue knew the serial number was obliterated.

### D. The Sentence

The Presentence Investigation Report ("PSR"), based on the 1994 Guidelines, calculated Lanoue's adjusted offense level as 28. The Guidelines provided an offense level of 24 for the firearms offense if it was not committed in connection with "another felony," U.S.S.G. § 2k2.1(a)(2), but the PSR added 4 levels pursuant to U.S.S.G. § 2k2.1(b)(5) based on "information submitted by the government indicat[ing] that the defendant was about to engage in the robbery of a Meehan armored car." With an offense level of 28 and a criminal history category of VI, the imprisonment range was 140 to 175 months. The PSR grouped the three counts together pursuant to § 3D1.2(b) and applied the firearms offense level of 28 as the highest level of the counts in the group.[12] *See* U.S.S.G. § 3D1.3(a).

Lanoue objected to the 4–level enhancement, arguing that he should not be sentenced on the basis of the robbery-related crimes of which the jury had acquitted him, and that the government had not proved those crimes by a preponderance of the evidence. The court imposed the 4–level enhancement on the basis that Lanoue used or possessed the firearm in connection with the crimes of which the jury had acquitted him— conspiracy and attempt to commit robbery, and using or carrying a firearm in connection with a conspiracy or attempt to commit robbery.[13] The court found that those crimes had been proved by at least a preponderance of the evidence, and expressed its direct disagreement with the jury's verdicts of acquittal.[14]

The court sentenced Lanoue to 175 months, at the maximum end of the range. Pursuant to U.S.S.G. § 5G1.2(d), because the statutory maximums were all below the

---

**12.** The offense level for the stolen car count was 6, consisting of a base offense level of 4 and an enhancement of 2 for the value of the Oldsmobile. *See* U.S.S.G. § 2B1.1. The offense level for the conspiracy count was that of the substantive offenses. *See* § 2X1.1.

**13.** The government had alternatively argued that transportation of the stolen car could constitute the "other felony." The court found that the "in connection with" requirement was not satisfied with respect to that offense because firearms are not inherently associated with that type of offense and the firearm was not used to effect its commission.

**14.** In addition to describing the facts upon which it based its finding, the court stated:

I am at a loss to explain the Jury's verdict on those three counts. It seemed to me the evidence was overwhelming. The Jury saw it differently ... I just don't know what the Jury concluded or why it reached the conclusion that it did.

range,[15] the court imposed 60 months imprisonment on Count I, 115 months consecutive imprisonment on Count V, and 60 months concurrent imprisonment on Count VI. Lanoue's sentence was enhanced by 50 months based on the crimes of which he had been acquitted, amounting to a 40% increase in his sentence.

Lanoue argues on appeal that we should take this opportunity to reconsider our holding in *United States v. Mocciola*, 891 F.2d 13 (1st Cir.1989), permitting sentencing on the basis of acquitted conduct, because it violates the right to a jury trial and engenders disrespect for the law, and alternatively that the trial court clearly erred in finding that he had committed the robbery-related crimes by a preponderance of the evidence. Lanoue's arguments are now moot because only the conviction for transportation of a firearm with an obliterated serial number stands, with a statutory maximum of five years, well below the Guidelines range of 100 to 125 months he would receive without the enhancement.

Although it makes no difference in this case, we believe that a defendant's Fifth and Sixth Amendment right to have a jury determine his guilt beyond a reasonable doubt is trampled when he is imprisoned (for any length of time) on the basis of conduct of which a jury has necessarily acquitted him. Moreover, we believe that the Guidelines' apparent requirement that courts sentence for acquitted conduct utterly lacks the appearance of justice. This panel urges the court to reconsider en banc the issue of acquitted conduct when it is next squarely presented.

## III. CONCLUSION

For the foregoing reasons, the judgments on Counts I and V are vacated and those counts are remanded for a new trial. The conviction on Count VI is affirmed. Because Count VI is the only remaining conviction, the statutory maximum of 60 months for violation of 18 U.S.C. § 922(k) sets the upper limit of the sentence. Because Lanoue's

Guideline sentence would be greater than 60 months with or without the 4–level enhancement, we order the sentence on Count VI to be 60 months imprisonment.

---

**15.** The conspiracy statute carries a five-year maximum; interstate transportation of a stolen motor vehicle carries a ten-year maximum; and interstate transportation of a firearm with an obliterated serial number carries a five-year maximum.