USCA1 Opinion

 

 July 12, 1996 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________ No. 94-2226 UNITED STATES, Appellee, v. JAMES L. MITCHELL, Defendant - Appellant. ____________ ERRATA SHEET The opinion of this Court issued on June 5, 1996, is amended as follows: Page 6, paragraph 1, is amended to read: Traditionally, in the context of a motion to suppress, we have reviewed the district court's findings of fact, as well as any mixed findings of law and fact, for clear error. See United States v. Schiavo, 29 F.3d ___ _____________ _______ 6, 8 (1st Cir. 1994); United States v. ______________ Rodr guez-Morales, 929 F.2d 780, 783 (1st _________________ Cir. 1991), cert. denied, 502 U.S. 1030 _____________ (1992). A recent Supreme Court case, however, determines that "as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on _______ appeal." Ornelas v. United States, 116 _______ ______________ S. Ct. 1657, 1663 (1996) (noting that findings of historical fact are reviewed only for clear error and that "due weight" should be given "to inferences drawn from those facts by resident judges and local law enforcement officers"). Therefore, to the extent that our analysis turns on making those determinations, our review is de novo, _______ as is our review of the district court findings of law. See Mart nez-Molina, 64 ___ _______________ F.3d at 726. UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-2226 UNITED STATES, Appellee, v. JAMES L. MITCHELL, Defendant - Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Mark L. Wolf, U.S. District Judge] ___________________ [Hon. Lawrence P. Cohen, U.S. Magistrate Judge] _____________________ ____________________ Before Torruella, Chief Judge, ___________ Coffin, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ _____________________ Walter B. Prince, by Appointment of the Court, with whom ________________ Peckham, Lobel, Casey, Prince & Tye was on brief for appellant. ___________________________________ Kevin J. Cloherty, Assistant United States Attorney, ____________________ Donald K. Stern, United States Attorney, and Sheila W. Sawyer, _______________ _________________ Assistant United States Attorney, were on brief for appellee. ____________________ June 5, 1996 ____________________ TORRUELLA, Chief Judge. The defendant in this arson TORRUELLA, Chief Judge. ____________ case stands convicted by a jury of conspiracy and arson under 18 U.S.C. 371 and 844(i), respectively. For the reasons stated herein, we affirm the decision of the district court on all points. I. BACKGROUND I. BACKGROUND On the evening of February 6, 1989, the Boston Fire Department responded to a multiple-alarm fire at 295-297 Franklin Street (the "Building"), in Boston, which was owned by Jack Gateman ("Gateman"). At that time, the defendant, James L. Mitchell ("Mitchell"), was a tenant occupying the Building's second, third and fourth floors, where he and his partner, Allen Gallant ("Gallant"), ran a private social club known as "Club 297" (the "Club"). The Club had been ordered closed by the City of Boston for violation of City codes in January 1989. On the day of the fire, several men, including Ronald Wallace ("Wallace"), had been working on repairs at the Club. Wallace testified at trial that during the course of that day Mitchell told him he would pay him $11,000 to set fire to the Building, making an initial payment. Mitchell returned to his home in Vermont, while Wallace returned to the Club. Mitchell called the Club from his car telephone, and spoke to Wallace, who testified that Mitchell asked him whether he would set the fire. After the phone call, Wallace went to the fourth floor of the Building and set some mattresses stacked there on fire. He and the other men in the Club fled the Building. -2- Over the next months, Mitchell wired Wallace sums of money through Western Union. Evidence was entered that Gallant reported the loss the Club suffered in the fire to the Club's insurance broker, and pursued the claim through an insurance broker. Testimony at trial established that some $59,400 was paid out on the Club's policies, most of which went to the Internal Revenue Service. In November 1991, Mitchell was charged under a twenty- two count indictment with conspiracy, arson, use of fire to commit a felony, and wire fraud. He was prosecuted on six of those counts. After a jury trial, he was found guilty on the conspiracy and arson charges, but acquitted of the remaining counts. This appeal ensued. II. ADMISSION OF SEIZED EVIDENCE II. ADMISSION OF SEIZED EVIDENCE The district court adopted the report and recommendation of the magistrate judge, who found the following facts. See United States v. Mart nez-Molina, 64 F.3d 719, 723 ___ _____________ _______________ (1st Cir. 1995) ("We recite the facts adduced at a suppression hearing in the light most favorable to the district court's ruling to the extent that they derive support from the record and are not clearly erroneous."). On the night of the fire, Lieutenant Paul R. LeBlanc ("Lt. LeBlanc") of the Fire Investigation Unit reported to the scene of the fire. After it was "put down," within an hour or so of being reported to the Fire Department at 9:15 p.m., Lt. LeBlanc entered the premises, along with two associates, in order to determine the cause and -3- origin of the fire. He seized carpet samples and sections of stair rises, later entered in evidence at trial. Irregular burn patterns prompted him to suspect that the fire was not accidental, and that it originated on the fourth floor. Adequate photographs could not be taken, however, since there was no light and the water on the floor precluded reliable flash photography. The following morning, between 8:00 and 9:00 a.m., Lieutenant Roy Burrill ("Lt. Burrill"), also of the Fire Investigation Unit, was sent to the site without a warrant. He seized two sections of flooring from the fourth floor. A third search was conducted by First Security Company, a private investigation company hired by Gateman to determine the cause of the fire. They also seized samples from the fourth floor. On appeal, Mitchell challenges the trial court's admission of the evidence seized by Lt. Burrill, on the basis that there were no exigent circumstances justifying his entrance without a warrant.1  ____________________ 1 Although he does not clearly state that his appeal is limited to the evidence admitted from Lt. Burrill's search, Mitchell's argument does not address the other two searches, and so we limit our analysis to Lt. Burrill's search and seizure. We note in passing, however, that even if Mitchell has not waived the right to object to the admission of the evidence from the other searches, see infra, the district court undoubtedly did not err ___ _____ in admitting that evidence, for the very reasons pronounced by the magistrate judge. First, Lt. LeBlanc's search was constitutional under the rationale of Michigan v. Tyler, 436 U.S. ________ _____ 499, 510 (1978) ("Officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished."). Second, First Security Company's search was a purely private search and seizure that did not involve official action; as such, it does not come under the Fourth Amendment, which does not proscribe unreasonable searches and seizures by private persons. See United States v. Jacobsen, ___ _____________ ________ -4- A. Waiver A. Waiver ______ The United States claims that Mitchell waived the right to appeal the admission of this evidence by failing to object within ten days to the magistrate judge's report and recommendation on the defendant's Motion to Suppress the Physical Evidence. See Rule 3(b), Rules for United States Magistrates in ___ the United States District Court for the District of Massachusetts. As the report and recommendation of the magistrate judge itself pointed out, we have repeatedly indicated that failure to comply with Rule 3(b) precludes review by this court. See, e.g., United States v. Valencia-Copete, 792 F.2d 4, ___ ____ _____________ _______________ 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 379 (1st _____________ ____ Cir. 1982) ("There can be no appeal from a magistrate's report and recommendation unless objections are filed thereto."). Mitchell now maintains that his objection to the evidence seized by Lt. Burrill has been saved from waiver despite his failure to object because, subsequent to the report and recommendation, the district court issued an order stating it would reconsider the suppression issue as regards the evidence seized by Lt. Burrill. In that order, the district court requested, among other things, that Mitchell identify the portions of memoranda and evidence the court should consider in deciding the motion to suppress the evidence seized. All of the seized evidence offered was admitted at trial. We need not delve into the intricacies of whether the district court order  ____________________ 466 U.S. 109, 113 (1984). -5- effectively revived Mitchell's motion to suppress the evidence seized by Lt. Burrill, however, as we find that the district court did not err in admitting the disputed evidence. -6- B. Analysis of Search and Seizure Issues B. Analysis of Search and Seizure Issues _____________________________________ Traditionally, in the context of a motion to suppress, we have reviewed the district court's findings of fact, as well as any mixed findings of law and fact, for clear error. See ___ United States v. Schiavo, 29 F.3d 6, 8 (1st Cir. 1994); United _____________ _______ ______ States v. Rodr guez-Morales, 929 F.2d 780, 783 (1st Cir. 1991), ______ _________________ cert. denied, 502 U.S. 1030 (1992). A recent Supreme Court case, ____________ however, determines that "as a general matter determinations of reasonable suspicion and probable cause should be reviewed de __ novo on appeal." Ornelas v. United States, 116 S. Ct. 1657, 1663 ____ _______ _____________ (1996) (noting that findings of historical fact are reviewed only for clear error and that "due weight" should be given "to inferences drawn from those facts by resident judges and local law enforcement officers"). Therefore, to the extent that our analysis turns on making those determinations, our review is de __ novo, as is our review of the district court findings of law. ____ See Mart nez-Molina, 64 F.3d at 726. ___ _______________ Our analysis is framed by two Supreme Court decisions: Michigan v. Tyler, 436 U.S. 499 (1978), and Michigan v. Clifford, ________ _____ ________ ________ 464 U.S. 287 (1984). The basic Fourth Amendment framework is clear. "Courts have consistently followed 'one governing principle' in interpreting [the Fourth Amendment]: 'except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant.'" Mann v. Cannon, ____ ______ 731 F.2d 54, 58 (1st Cir. 1984) (quoting Camara v. Municipal ______ _________ -7- Court, 387 U.S. 523, 528-29 (1967)). Nonetheless, "a warrantless _____ entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." Tyler, 436 U.S. at 509. Mitchell's core _____ contention here is that there were no such exigent circumstances in the present case, and so Lt. Burrill's warrantless search was unconstitutional, and the evidence he seized should have been suppressed. The analysis in Michigan v. Tyler controls our ________ _____ decision. In Tyler, a fire broke out in a furniture store _____ shortly before midnight; the fire had been reduced to "smoldering embers" when the Fire Chief reported to the scene at 2:00 a.m. Id. at 501. He concluded that the fire was possibly the result ___ of arson, and called a police detective, who took some photographs, but "abandoned his efforts because of the smoke and steam." Id. at 502. After a brief survey through the rest of ___ the building to look for further evidence of the cause of the fire, the Chief and police detective left the site. Four hours later, the Chief returned with the Assistant Chief, whose task it was to determine the origin of all fires in the township. The fire was out, and the building was empty. They quickly left, returning with the police detective around 9:00 a.m. They found suspicious burn marks, not visible earlier, and took samples of carpet and stairs. Rejecting the premise that "the exigency justifying a warrantless entry to fight a fire ends, and the need to get a -8- warrant begins, with the dousing of the last flame," id. at 510, ___ the Court found the two searches conducted on the morning after the fire were constitutionally permitted. After noting that the investigation on the night of the fire was hindered by the darkness as well as the steam and smoke, the Court found that the fire officials departed at 4 a.m. and returned shortly after daylight to continue their investigation. Little purpose would have been served by their remaining in the building, except to remove any doubt about the legality of the warrantless search and seizure later that same morning. Under these circumstances, we find that the morning entries were no more than an actual continuation of the first . . . . Id. at 511. ___ The facts here closely parallel those of Tyler. _____ Lt. LeBlanc entered the scene after the fire was "put down," and within roughly an hour of the time the fire was reported, in order to determine the cause and origin of the fire. The investigation was hampered by the lack of light and by the presence of water on the floor: photographs could not be taken. The following morning, between 8:00 and 9:00 a.m., roughly twelve hours after the fire had been reported, Lt. Burrill entered the scene in order to take additional samples. He removed the water and debris from the fourth floor, and then seized two sections of flooring, the challenged evidence. These facts speak for themselves: Lt. Burrill's search and seizure was clearly a continuation of the first search by Lt. LeBlanc. Unlike in Tyler, of course, the same individual did not conduct both _____ -9- searches, but both fire officials were of the same Fire Investigation Unit. Ultimately, as in Tyler, the "investigation _____ of the fire's origin was [] temporarily suspended on account of the conditions on the scene and resumed at the first opportunity when the conditions hampering the investigation subsided." Clifford, 464 U.S. at 301. ________ That Lt. Burrill's morning entrance onto the premises was in fact a continuation of the nighttime search is underscored by the distinctions the Court drew between its decision in Clifford and its Tyler holding. In Clifford, a fire broke out in ________ _____ ________ a private residence and the fire department reported to the scene at about 5:42 in the morning. The fire was extinguished, and the fire officials and police left the premises at 7:04 a.m. At about 1:00 p.m. that afternoon a fire investigator arrived at the scene, having been informed that the fire department suspected arson. Despite the fact that the house was being boarded up on behalf of the out-of-town owners, the Cliffords, and despite their knowledge that the Cliffords did not plan to return that day, the fire investigator and his partner searched the house. After determining that the fire had been set in the basement, and how, the investigators searched the entire house, taking photographs. Id. at 289-91. In finding that the challenged ___ search by the fire investigator was not a continuation of an earlier search, as in Tyler, and in distinguishing between the _____ two cases, the Court noted: Between the time the firefighters had extinguished the blaze and left the scene -10- and the arson investigators first arrived about 1:00 p.m. to begin their investigation, the Cliffords had taken steps to secure the privacy interests that remained in their residence against further intrusion. These efforts separate the entry made to extinguish the blaze by that made later by different officers to investigate its origin. Second, the privacy interests in the residence -- particularly after the Cliffords had acted -- were significantly greater than those in the fire-damaged furniture store [in Tyler], making the _____ delay between the fire and the mid-day search unreasonable absent a warrant, consent, or exigent circumstances. Id. at 296. These facts play no role here: there was no ___ evidence of an effort to secure the burned-out premises, and the heightened privacy interests a property owner has in a home are not present. See id. at 297 (noting that "privacy interests are ___ ___ especially strong in a private residence."). Unlike the private dwelling in Clifford, this was a commercial property. Mitchell ________ points out that he was in Vermont at the time of the fire in the premises he had leased; however, he made no effort to arrange for the premises to be closed off, unlike the defendants in Clifford, ________ who were similarly away from their home. These facts permitted the magistrate judge to conclude that the search by Lt. Burrill was merely a continuation of Lt. LeBlanc's search, and, thus, that "there was simply nothing unreasonable, in Fourth Amendment terms, to [sic] reentering the building and completing the already commenced investigation of the cause and origin of the fire when circumstances -- i.e., adequate lighting provided by daylight and removal of the debris and water -- first reasonably -11- permitted." (Report and Recommendation, page 11). In Clifford the Court laid out three factors for ________ analyzing the constitutionality of warrantless searches of fire- damaged premises: whether there are legitimate privacy interests in the fire-damaged property that are protected by the Fourth Amendment; whether exigent circumstances justify the government intrusion regardless of any reasonable expectation of privacy; and, whether the object of the search is to determine the cause of the fire or to gather evidence of criminal activity. Clifford, 464 U.S. at 291; see Mann, 731 F.2d at 59-60 (weighing ________ ___ ____ the Clifford factors in evaluating warrantless entry onto private ________ premises for health and safety reasons). First, as noted, Mitchell can have had few privacy interests in the Building. "Privacy expectations will vary with the type of property, the amount of fire damage, the prior and continued use of the premises, and in some cases the owner's efforts to secure it against intruders." Clifford, 464 U.S. at 292; see Mann, 731 ________ ___ ____ F.2d at 59 (noting that privacy considerations in virtually abandoned residence used as storehouse were minimal). Mitchell focuses his argument on the second factor, exigent circumstances. As he notes, at the time Lt. Burrill entered the grounds, the fire was out, there were no people in the building, and there was no danger of further damage, or of flammable materials being present. However, the Court has clearly established that "officials need no warrant to remain in a building for a reasonable time to investigate the cause of a -12- blaze after it has been extinguished." Tyler, 436 U.S. at 510; _____ see Clifford, 464 U.S. at 293 (noting that "[b]ecause determining ___ ________ the cause and origin of a fire serves a compelling public interest, the warrant requirement does not apply in such cases."). Because the magistrate judge properly found that Lt. Burrill's entrance onto the premises was in fact a continuation of Lt. LeBlanc's search, and there is no question as to that search's constitutionality, Mitchell's exigent circumstances argument fails. Indeed, this is precisely the level of exigency -- the fire was extinguished, the building was empty, and conditions had hampered investigations the night before -- whose constitutionality the Supreme Court upheld in Tyler. _____ The third Clifford factor examines the purpose of the ________ search. Here, the district court adopted the magistrate judge's finding that Lt. LeBlanc entered the site to determine the cause and origin of the fire, and that Lt. Burrill "was dispatched to the scene for the purpose of taking additional samples." The lower court concluded that there was no showing that the fire department suspected arson when Lt. Burrill was sent to the scene of the fire. Indeed, Lt. LeBlanc was only one of three investigators on the scene, and no evidence was presented that the other investigators shared his opinions, much less that any of them communicated their impressions to Lt. Burrill. In his brief, however, Mitchell seems to challenge that -13- finding, stating that Lt. Burrill2 "entered the premises without a warrant specifically to look for and seize evidence of arson." (Brief of Appellant, p. 14). Mitchell's counsel contended at oral argument that the magistrate judge's finding that Lt. Burrill did not suspect arson was improbable, and that common sense should indicate that Lt. LeBlanc communicated his findings to Lt. Burrill. We disagree. Lt. Burrill testified that as soon as he started his shift he was sent to the scene, and that "[f]requently after a fire has occurred at night, they send the day crew to the scene . . . because of the benefit of daylight, it [is] easier to get samples." (Day 1, p. 96). Lt. LeBlanc, in turn, testified that the Fire Investigation Unit reported to the fire because it was a multiple-alarm fire, to which the Unit's response is automatic. Based on this testimony and our deferential standard of review, we see no reason to find that the court erred in its finding of fact. Based on the above, we affirm the district court's refusal to suppress the evidence from Lt. Burrill's search. III. ADMISSION OF THE TAPED CONVERSATIONS III. ADMISSION OF THE TAPED CONVERSATIONS Prior to and after the fire, Mitchell tape-recorded a series of telephone conversations he had with other people, including Wallace and Gallant, without their consent or knowledge. Excerpted portions of three of these tapes were  ____________________ 2 In fact, defendant's brief refers to nameless "Boston Fire Department Inspectors" who entered the building on the day following the fire. As Lt. Burrill is the only official fitting that description who seized evidence at issue here, we assume that defendant was describing him. -14- admitted at trial. On appeal, Mitchell argues that the district court committed reversible error in limiting the use of the tapes, for two reasons. First, he maintains, the taped conversations were admissible to show bias and inconsistent testimony. Second, he contends that all the tapes, not just fragments of them, were admissible for purposes of impeachment. As he does not specify, in either his brief or at oral argument, which tapes he actually seeks to enter, why each portion should be played, or the purpose for which each excerpt not previously admitted should now be allowed, we limit our discussion to those tapes actually entered at trial.3  ____________________ 3 Mitchell's counsel stated that there were twenty-one tapes in all, with roughly twenty-eight hours of recordings. Three tapes were actually entered at trial, but two other tapes were discussed. First, defense counsel offered a tape of a conversation between Mitchell and David Collins, an insurance broker, in his cross-examination of Collins during voir dire outside the jury's presence, in order to refresh his recollection and knowledge. At the prosecution objection to the tape being played, and after some discussion, the court excused the witness for the day so that the prosection could hear the tape. The next day, the following colloquy ensued (Mr. Prince is defense counsel; Mr. Cloherty is the prosecutor): THE COURT: . . . . Now, with regard to the Collins' [sic] telephone call, have you heard that tape? MR. CLOHERTY: Yes, Your Honor. MR. PRINCE: We have resolved that issue, Your Honor. MR. CLOHERTY: Mr. Prince isn't going to play it. That's withdrawn. THE COURT: All right. (Day 9, p. 12). Since the tape was withdrawn, we do not consider it here. Similarly, there was some discussion of a tape recorded on February 8, 1989, but defense counsel ultimately stated to the court that he would not be offering anything from that tape, and so we do not address it here.  -15- A. The Legal Framework A. The Legal Framework ___________________ A party waives a right when it makes an "'intentional relinquishment or abandonment'" of it. United States v. Olano, _____________ _____ 507 U.S. 725, 733 (1993) (quoting Johnson v. Zerbst, 304 U.S. _______ ______ 458, 464 (1938)); see United States v. Marder, 48 F.3d 564, 571 ___ _____________ ______ (1st Cir.), cert. denied, 115 S. Ct. 1441 (1995). However, if a ____________ defendant merely fails to make a timely assertion of that right, only forfeiture results. Olano, 507 U.S. at 733; see Fed. R. _____ ___ Crim. P. 52(b). The distinction is a key one, for [m]ere forfeiture, as opposed to waiver, does not extinguish an "error" under Rule 52(b). . . . If a legal rule was violated during the District Court proceedings, and if the defendant did not waive the rule, then there has been an "error" within the meaning of Rule 52(b) despite the absence of a timely objection. Id. at 773-74. In short, where there was forfeiture, we apply a ___ plain error analysis; where there was waiver, we do not. See ___ United States v. Lakich, 23 F.3d 1203, 1207 (7th Cir. 1994) ______________ ______ (noting that the "'Plain Error Rule' may only be invoked in instances of 'forfeited-but-reversible error,' . . . . because if there has been a valid waiver, there is no 'error' for us to correct."); see, e.g., United States v. de la Cruz-Paulino, 61 ___ ______ _____________ ___________________ F.3d 986, 995 (1st Cir. 1995) (holding that where defendant did not object to prosecution's use of taped conversations, the issue was not preserved for appeal, but plain error analysis applied); Marder, 48 F.3d at 571 (holding that, because there was no ______ waiver, plain error analysis applied). See generally, United ______________ ______ -16- States v. Taylor, 54 F.3d 967, 972-73 (1st Cir. 1995) (stating ______ ______ the policy reasons and rationale for the raise-or-waive rule).4 B. The Tapes B. The Tapes _________ 1. The February 7, 1989 Tape 1. The February 7, 1989 Tape Mitchell recorded two conversations between himself and Wallace on February 7, 1989. Defendant sought to enter portions from that tape as evidence of prior inconsistent statements. At a hearing on the admissibility of the tape outside of the jury's presence, the following colloquy ensued (Mr. Prince is the defense counsel, Mr. Cloherty the prosecutor). THE COURT: . . . . Mr. Cloherty, what is the Government's position on playing all of the February 7 tape with the exception of the two edits we discussed? MR. CLOHERTY: We would want the entire tape played with the exception of those edits. THE COURT: And that remains agreeable to the defendant? MR. PRINCE: Yes, Your Honor, and Mr. Cloherty and I will edit the conversation. (Day 5, pp. 112-13). At the start of the next day of trial, the court asked the attorneys whether the tapes had been "edited to [their] mutual satisfaction"; Mitchell's counsel did not disagree when the prosecution stated that they had. (Day 6, p. 5). Nor  ____________________ 4 In United States v. Taylor, we stated that the "raise-or-waive _____________ ______ rule is not absolute. But, rescue missions are restricted to the correction of 'plain' errors," 54 F.3d at 972, without delving into the difference between forfeiture and waiver. We therefore note that the distinction we draw today between them does not conflict with Taylor, in that Taylor was concerned with failure ______ ______ to timely object -- i.e., forfeiture. Id. (noting that "a ___ litigant who deems himself aggrieved . . . ordinarily must object then and there, or forfeit any right to complain at a later time.").  -17- did he object when the tapes were offered. Clearly, Mitchell has waived any objection to the court's failure to play the entire tape. Not only did he not object to the use of the tape, but he affirmatively stated that he was agreeable to the use of the edited tape -- there was a "direct inquiry from the court" and an "unequivocal assent" from counsel for the defense. Marder, 48 F.3d at 571 (holding that ______ defendant did not waive issue where there was no such clear colloquy, but merely a failure to object). That action raises his later silence from mere forfeiture to waiver. 2. The February 1, 1989 Tape 2. The February 1, 1989 Tape Mitchell next sought to introduce excerpts from a conversation taped between Mitchell and Gallant prior to the fire. He offered the dialogue, which discussed re-opening the Club, as evidence of his then-existing state of mind. See Fed. ___ R. Evid. 803(3). The court stated that the entire tape could not be played, on the basis that most of it was irrelevant and inadmissible. However, the next day, based on a transcript indicating what excerpts the defendant wanted to use, and which of those the government objected to, the court admitted all the excerpts Mitchell requested. Mitchell now appears to contend that the entire tape should have been admitted. Had Mitchell merely submitted the entire tape, and the court only admitted excerpts, the defense's failure to object that the remainder of the tape was not submitted to the jury may only have resulted in forfeiture, Olano, 507 U.S. at 733, as _____ -18- there may have been no "'intentional relinquishment or abandonment of a known right,'" and so no waiver. Id. (quoting ___ Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). But the defense's _______ ______ actions went beyond this: Mitchell took an active role in limiting the portions considered by the district court by providing the excerpts himself. Ultimately, the court admitted all the excerpts he submitted. This, paired with his failure to object, raises his acts to the level of waiver. See Marder, 48 ___ ______ F.3d at 570-71. Indeed, Mitchell does not offer any argument as to why we should not deem the portions not actually offered as waived. We will not look beyond the waiver and ask whether the court committed plain error. 3. The February 11, 1989 Tape 3. The February 11, 1989 Tape The third tape discussed at trial was a February 11, 1989, recording of Mitchell's conversation with his partner Gallant about whether the Club had insurance at the time of the fire. At a hearing on the tape's admissibility prior to Gallant's testimony, the court characterized it as "a really transparent effort by the defendant, Mr. Mitchell, knowing that he was accused of setting the arsons [sic], . . . [to say] all sorts of things that would be very inadmissible and also things of doubtful admissibility on the stand." (Day 9, p. 7). Accordingly, the court ruled that the tape was inadmissible to prove state of mind under Fed. R. Evid. 803(3), as the conversation occurred after the fire. The defense objected on the basis that the tape was in fact relevant to the defendant's -19- state of mind regarding the alleged wire fraud, and the court reconsidered its ruling. Accordingly, it requested a marked-up transcript of the portions of the tape the defense sought to admit on that basis, so it could "see what is at issue." (Day 9, p. 141). The next day, the court held that the first of the two marked pages defendant submitted could be admitted; it was read to the jury later that day, without a limiting instruction. The court also allowed the second submitted page to be entered, but as a prior inconsistent statement, and gave a limiting instruction to the jury. Defense counsel did not object to the court's rulings. For the same reasons discussed above, as the only portions of the tape the defense actually submitted to the court were entered, and there was no objection entered, we find that the defense waived any appeal that the remainder of the tape should have been admitted. See id.  ___ ___ As we find that the defendant has waived the right to argue that these three tapes should have been admitted in their totality, we need not consider his contentions that they were admissible to show bias and inconsistent testimony or for purposes of impeachment. IV. THE JURY INSTRUCTIONS IV. THE JURY INSTRUCTIONS Mitchell challenges the district court's jury instructions regarding the conspiracy charge. We review the propriety of jury instructions for abuse of discretion. United ______ States v. Cassiere, 4 F.3d 1006, 1022 (1st Cir. 1993); United ______ ________ ______ -20- States v. Campusano, 947 F.2d 1, 5 (1st Cir. 1991). Accordingly, ______ _________ "[w]e must look at the instructions in light of the evidence and determine whether they 'fairly and adequately submit[] the issues in the case to the jury.'" United States v. Picciandra, 788 F.2d _____________ __________ 39, 46 (1st Cir.) (quoting United States v. Fishbach and Moore, _____________ ____________________ Inc., 750 F.2d 1183, 1195 (3d Cir. 1984), cert. denied, 470 U.S. ____ _____________ 1029 and sub nom. Sargent Elec. Co. v. United States, 470 U.S. ________ __________________ ______________ 1085)), cert. denied, 479 U.S. 847 (1986). For the reasons _____________ stated below, we find the district court did not abuse its discretion in making its instructions to the jury. Count I of the indictment alleged that Mitchell conspired with Wallace to violate the arson statute, see 18 ___ U.S.C. 844(i), and the wire fraud statute, see 18 U.S.C.  ___ 1343.5 The charge was made in the conjunctive. The district court, however, instructed the jury in the disjunctive: The first count charges a conspiracy to commit arson and a conspiracy to commit wire fraud. In order to prove the defendant is guilty of Count 1, the government doesn't have to prove that any demonstrated conspiracy had both laws or a violation of both laws as its object. It's sufficient that the government prove either the conspiracy to commit arson or the conspiracy to commit wire fraud. But you have to unanimously agree. That is essential. When you deliberate,  ____________________ 5 The remaining five counts charged Mitchell with arson, wire fraud, and use of a fire to commit a felony. See 18 U.S.C. ___ 844(i), 1343, & 844(h). -21- all 12 of you have to agree on everything. So it would be insufficient if six of you thought there was a conspiracy to commit arson and six of you thought there was a conspiracy to commit wire fraud. You have to unanimously agree, or try to. But if you agree unanimously that a conspiracy to violate one of those statutes has been proven beyond a reasonable doubt, that's sufficient to find the defendant guilty on Count 1. (Day 12, pp. 159-60).6 Mitchell contends that the court's instruction that finding him guilty of one of the two conspiracies is sufficient impermissibly broadened the allegations in Count I so as to create, in effect, two conspiracy counts.7 In answering defendant's argument we take our lead from the Supreme Court. In Griffin v. United States, 502 U.S. 46 _______ ______________ (1991), the petitioner was charged with a conspiracy alleged to have two objects, but was implicated in only one of those. The court instructed the jury that it could return a guilty verdict against petitioner if it found that she had participated in either of the two objects, and the jury returned a general verdict of guilty, without specifying on which count it relied. Id. at 47-48. Faced with the question whether the verdict should ___  ____________________ 6 Mitchell specifically objected to the instruction at the close of the charge. 7 In making this argument, Mitchell adds that the jury was left to speculate as to whether Mitchell conspired to commit arson with Wallace, to commit wire fraud with Wallace, and possibly Gallant, or to commit both charges involving Gallant. Neither the indictment nor the jury instructions mention Gallant, however. -22- be set aside because the evidence was insufficient for one of the objects, the Court affirmed the verdict. In so doing, it relied on a common law rule dating back to pre-revolutionary England stating that "'[w]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged.'" Id. at 56-57 (quoting Turner v. ___ ______ United States, 396 U.S. 398, 420 (1970)); see United States v. ______________ ___ _____________ Nieves-Burgos, 62 F.3d 431, 436 (1st Cir. 1995) (discussing _____________ Griffin and the relevant case law).8 Accordingly, in United _______ ______ States v. Lanoue, 71 F.3d 966 (1st Cir. 1995), where the district ______ ______ court instructed the jury "that it could convict Lanoue of conspiracy if it found he conspired to commit any one or more of six object offenses" listed in the conspiracy count, id. at 979, ___ we held that, as there was sufficient evidence for one of the  ____________________ 8 There is an important exception to the rule discussed in Griffin, however. "Griffin distinguishes cases . . . which _______ _______ concern convictions that may have rested on a basis that was not supported by the evidence, from those concerning convictions possibly resting on an invalid ground as a result of an error of law." Nieves-Burgos, 62 F.3d at 436; see Griffin, 502 U.S. at 58 _____________ ___ _______ (defining "legal error" as "a mistake about the law, as opposed to a mistake concerning the weight or the factual import of the evidence"). In the case of legal errors "'the proper rule to be applied is that which requires a verdict to be set aside where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected.'" Id. ___ at 52 (quoting Yates v. United States, 354 U.S. 298, 312 (1957), _____ _____________ overruled by Burks v. United States, 437 U.S. 1 (1978)). _____________ _____ ______________ However, appellant does not argue that the conviction rested on an invalid ground, due to an error of law; rather, he focuses on the sufficiency of the evidence of the charges, the very concern at issue in Griffin. Therefore, we need not discuss this _______ exception here. See id. at 55 (noting that the exception has ___ ___ generally been applied "to general-verdict convictions that may have rested on an unconstitutional ground."). -23- object offenses, we did not need to decide whether there was sufficient evidence of a conspiracy to commit any or all of the other object offenses, id. at 982-83 (holding that the fact that ___ there was sufficient evidence allowed a new trial despite vacation of the conspiracy count on other grounds). Likewise, in United States v. Nieves-Burgos, we applied Griffin to uphold the _____________ _____________ _______ jury verdict where there was sufficient evidence to find defendant guilty for only one of three violations alleged in one charge. 62 F.3d at 436. Mitchell does not frame his argument in terms of Griffin and its progeny, however. Rather, he seems to make two _______ intertwined arguments. First, he contends that Count I must be read to charge him with only one offense, namely, agreeing to burn the Building and using interstate wire facilities to transfer money to Wallace. The instructions, he maintains, expanded this offense into two, opening him up to the danger of being convicted on facts different from those charged. A "court may not substantially amend the indictment through its instructions to the jury." United States v. Stewart Clinical ______________ ________________ Lab., Inc., 652 F.2d 804, 807 (9th Cir. 1981) (reversing a ___________ conviction where the indictment charged defendants with violating one subsection of 42 U.S.C. 1396h(b)(2) but the government's case proved a violation of another); see also United States v. ________ _____________ Trexler, 474 F.2d 369, 371 (5th Cir.) (stating that "[a]s a _______ general rule, the Government cannot broaden an indictment so as to convict the defendant on different facts from those charged in -24- the indictment"), cert. denied, 412 U.S. 929 (1973). As a result ____________ of this broadening of the indictment, he states, the Government was allowed to argue a "grab bag" of theories and ask the jury to guess as to which agreement Mitchell contemplated. This argument is substantially answered by our discussion of Griffin above. It is manifest that the district _______ court instruction that the jury could find Mitchell guilty on Count I if the government proved either of the objects of the conspiracy complies with Griffin. See Griffin, 502 U.S. at 56- _______ ___ _______ 57. Indeed, an instruction that both objects of the multi-object conspiracy had to be proved would go against the cited case law. As the district court did not err in presenting the charge in this manner, the fairness and integrity of the proceedings were not affected, contrary to Mitchell's contention otherwise. Similarly, Mitchell's argument that the instructions allowed the jury to use conjecture as to his role is quickly dismissed, as the instructions clearly limit the jury to the indictment, requiring them to reach unanimity to find guilt on either of the two objects of the conspiracy. Finally, to the extent that Mitchell's position is that the instructions were inconsistent with the Government's argument at trial, he is on shaky ground given that from the start of the trial the Government approached the conspiracy charge as a multiple object conspiracy, as demonstrated by its opening argument (describing the arson as "the first object of the conspiracy" and separately outlining the alleged wire fraud (Day 3, pp. 55 - 58)) and proposed jury -25- instructions ("you need not . . . find that the defendant . . . conspired to commit both arson and wire fraud."). Second, although he never states it in so many words, Mitchell seems to contend that there was insufficient evidence to prove the wire fraud charge of the conspiracy, and thus the jury verdict was against the weight of the evidence. As we have established that "'a guilty verdict on an indictment charging several acts in the conjunctive, . . . stands if the evidence is sufficient with respect to any one of the acts charged,'" Griffin, 502 U.S. at 56-57 (quoting Turner, 396 U.S. at 420), and _______ ______ Mitchell does not contest the sufficiency of the evidence as to the charge of conspiracy to commit arson,9 this position must also fail. V. THE MOTION FOR ACQUITTAL V. THE MOTION FOR ACQUITTAL Mitchell's next contention also centers on the evidence -- or lack thereof -- regarding the alleged conspiracy to commit  ____________________ 9 Mitchell lists the elements the Government had to prove for both objects of the conspiracy, but the only evidence he actually questions, regarding the use of interstate wire facilities, goes solely to the wire fraud claim. In a footnote, Mitchell also argues that the court expanded the conspiracy's scope "by allowing the Government to argue that Mitchell caused Gallant to file false and fraudulent information ______ with the insurance company." (Appellant's Brief, p. 34 n.39). He maintains that the Government was allowed to prove its case against Mitchell by showing (1) that he was partners with Gallant, and (2) that Gallant filed a claim for insurance proceeds without Mitchell's assistance. As this argument also goes solely to the sufficiency of the evidence regarding wire fraud, and there is no challenge to the sufficiency of the evidence on the conspiracy to commit arson charge, we need not address it. -26- wire fraud. 18 U.S.C. 1343.10 He posits that the district court committed reversible error in denying his motion for judgment of acquittal because there was no evidence that the defendant filed, or caused to be filed, an insurance claim. As he does not specify which count or counts he contends should be reversed, we focus on Count I, the conspiracy count, as this evidence clearly goes to the insurance fraud claim, not the arson claim. We review Mitchell's "challenge to the evidentiary sufficiency of the government's case by examining 'whether the total evidence, taken in the light most amicable to the prosecution, together with all reasonable inferences favorable to it, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant was guilty as charged.'" United States v. Castro-Lara, 970 F.2d 976, 979 (1st Cir. 1992) _____________ ___________ (upholding district court's denial of motion for judgment of acquittal), cert. denied sub nom. Sarraff v. United States, 508 ______________________ _______ ______________ U.S. 962 (1993).  ____________________ 10 That section states, in pertinent part: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio or television communication interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.  18 U.S.C. 1343. -27- Essentially, Mitchell argues the following. To prove wire fraud the Government had to prove: "1) a scheme to defraud by means of false pretenses, 2) the defendant's knowing and willful participation in the scheme with the intent to defraud, and 3) the use of interstate wire communications in furtherance of the scheme." Cassiere, 4 F.3d at 1011. The Government failed ________ to prove the first prong of the test because it did not show that Mitchell made any false representations to the insurance carriers, and so there was no false pretense. Instead, Gallant was responsible for preparing and presenting the insurance claim and proof of loss to the insurers. The prosecution did not show Mitchell knew or reasonably foresaw the filing of the claims as the consequence of his conduct. Since the Government's theory was that Mitchell hired Wallace to burn the Building because it had been closed by the city and he could no longer operate it, it was essential to the Government's claim to show that Mitchell knew the Club was insured and made a claim for the proceeds, or caused another to do so. However, Gallant testified that he made the claim without Mitchell's assistance, and that he actually had a dispute with Mitchell as to whether a claim should be processed. The only evidence that Mitchell filed an insurance claim was a letter from an Edward Garguilo to David Collins, the insurance broker, but there was no evidence connecting Mitchell to this letter, and no evidence showing that the letter formed the basis for a request for payment, and so it cannot form the basisfor anargument thatMitchell attemptedto consummatethe fraud. -28- Even if we accept all of his contentions as true, at most they establish that there was insufficient evidence to find Mitchell guilty of the wire fraud object of the conspiracy charge. As we have noted, "'if a jury returns a guilty verdict on an indictment charging several acts in the conjunctive,'" as the arson and wire fraud charges were made here, "'the verdict stands if the evidence is sufficient with respect to any one of the acts charged.'" Griffin, 502 U.S. at 56-57 (quoting Turner, _______ ______ 396 U.S. at 420); see, e.g., Lanoue, 71 F.3d at 982-83; Nieves- ___ ____ ______ _______ Burgos, 62 F.3d at 436. As Mitchell does not argue that there ______ was insufficient evidence for the arson charge, we deem that he has waived the opportunity to do so. See United States v. ___ _____________ Zannino, 895 F.2d 1, 17 (1st Cir.) (applying "the settled _______ appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."), cert. denied, 494 U.S. 1082 (1990). Thus the ____________ court did not err in refusing to grant the motion to acquit.11  ____________________ 11 Mitchell argues that the court erred in allowing the letter sent by Garguilo in evidence under the "business records" exception to the hearsay rule, see Fed. R. Evid. 803(6), because ___ Garguilo did not testify regarding the authenticity of the letter or its accuracy, and there was no testimony regarding what happened to the letter after Collins received it. However, Sharon Motyl, a claims technician for Insurance Innovators, testified that the claims files were maintained in the ordinary course of business and included documents received from a third party. She specifically stated that the Garguilo letter was maintained as part of the pertinent claim file in the ordinary course of business. Given this, we doubt that the district court abused its discretion in admitting the letter. See United States ___ _____________ v. Moore, 923 F.2d 910, 915 (1st Cir. 1991) (noting that review _____ of admission of evidence under the business records exception is for abuse of discretion). Even if it had, its error would not be prejudicial, as the letter was not relevant to the arson object -29- VI. MITCHELL'S SENTENCE VI. MITCHELL'S SENTENCE Mitchell's final contention on appeal is that the district court erred by enhancing his Basic Offense Level12 ("B.O.L.") by four points: two points for his role in the offense as an organizer, leader, manager or supervisor, see ___ U.S.S.G. 3B1.1(c), and two points for obstruction of justice, see U.S.S.G. 3C1.1. After noting our standard of review, we ___ address each of these enhancements in turn. For the reasons given below, we affirm the sentence given by the district court. A. Standard of Review A. Standard of Review __________________ "When we review a district court's application of a sentencing guideline, we utilize a bifurcated process. First, we review the guideline's legal meaning and scope de novo. Next, we _______ review the court's factfinding for clear error, giving due deference to the court's application of the guidelines to the facts." United States v. Thompson, 32 F.3d 1, 4 (1st Cir. 1994) _____________ ________ (citations omitted). "'Due deference' in this context means that, absent mistake of law, we will review the sentencing court's fact based application of the guidelines only for clear error.'" United States v. McDonough, 959 F.2d 1137, 1141 (1st Cir. 1992) _____________ _________  ____________________ of the conspiracy count. 12 As the sentencing guidelines in effect at the time of the sentencing were more onerous than those in effect at the time of the offense (Oct. 15, 1988), the district court applied the latter set of guidelines. The court found a base offense level of 6, see U.S.S.G. 2K1.4(a), and enhanced it 18 levels for ___ knowing creation of a substantial risk of death or serious bodily injury, see U.S.S.G. 2K1.4(b)(1). With the disputed ___ enhancements, the total adjusted offense level was 28. -30- (quotingUnited Statesv. Mart nez,922F.2d 914,925 (1stCir. 1991)). _____________ ________ B. Manager or Supervisor of a Criminal Activity B. Manager or Supervisor of a Criminal Activity ____________________________________________ The district court enhanced Mitchell's B.O.L. because it found he acted as Wallace's organizer in committing the crime. See U.S.S.G. 3B1.1(c).13 In order to apply section 3B1.1(c), ___ a court must first determine that there were at least two participants in the crime. See United States v. Akitoye, 923 ___ _____________ _______ F.2d 221, 227 (1st Cir. 1991). Here, the two participants were Wallace and Mitchell himself. See United States v. Morillo, 8 ___ _____________ _______ F.3d 864, 872 n.13 (1st Cir. 1993) ("The defendant himself may be counted in determining the overall number of participants."). "The second requirement for the application of section 3B1.1(c) is that the defendant exercised control over, or was otherwise responsible for organizing the activities of, at least one other individual in committing the crime." Akitoye, 923 F.2d _______ at 227. Here, the district court found at sentencing that Mitchell hired Wallace to burn the Club, as he was concerned that the City of Boston would not let the Club reopen, and he wanted to collect the insurance proceeds. It also found that Mitchell called the Club the night of the fire and, in effect, instructed Wallace to start the fire. Mitchell challenges these factual  ____________________ 13 At the time of the offense that section stated: If the defendant was an organizer, leader, manager, or supervisor in any criminal activity [involving four or fewer participants], increase by 2 levels. U.S.S.G. 3B1.1(c) (1987). -31- findings. He notes that Wallace testified that, when Mitchell called him at the Club on the night of the fire, he asked "are you going to do it?" The inference, Mitchell argues, is that Wallace was a free agent. Indeed, he maintains, their contact was almost casual, and it was up to Wallace to burn the Club or not. His argument is of no avail. There was evidence at trial that Mitchell initiated discussion of the arson, recruited Wallace to carry it out, told him specifically how to do it, and promised to pay him. Given the record, we find no clear error in the district court's factual findings. Compare United States v. _______ _____________ Balogun, 989 F.2d 20, 23 (1st Cir. 1993) (finding no clear error _______ in trial court's application of 3B1.1(c) where the facts showed defendant initiated the conspiracy, received more money than his co-conspirator, paid his co-conspirator for his cooperation in the scheme, and used cars fraudulently registered to the co- conspirator to stage accidents) with United States v. Castellone, ____ _____________ __________ 985 F.2d 21, 26 (1st Cir. 1993) (refusing to uphold application of 3B1.1(c) where the district court did not find defendant controlled anyone else's movements) and United States v. Fuller, ___ _____________ ______ 897 F.2d 1217, 1221 (1st Cir. 1990) (holding that "in the absence of any evidence that [defendant] exercised control over [other] persons or was otherwise responsible for organizing them in the commission of the offense, the mere fact that [defendant] had dealt with a large quantity of marijuana does not support a finding that he was an organizer, leader, supervisor, or manager" in conspiracy to distribute marijuana). -32- Mitchell seeks to rely on the Second Circuit's decision in United States v. McGregor, 11 F.3d 1133, 1139 (2d Cir. 1993), _____________ ________ in arguing that section 3B1.1(a) does not apply here. In that case, the court found that a drug dealer who asked his wife to give a package to buyers was not an organizer under section 3B1.1, since it was an isolated occurrence. Mitchell relies on McGregor to argue that the isolated request for assistance he ________ made to Wallace did not rise to the level the Guideline requires, noting that there was no evidence that they had acted in concert for any other criminal activity. His reliance is misplaced, however. The dealer in McGregor bought and resold at least four ________ ounces of cocaine a week for over a year, and involved his wife on only one occasion. His sentence reflected all his prior drug dealing activity. In this context, the court held that "against the whole background of the case" McGregor's use of his wife did not rise to the level of an organizer, leader, manager or supervisor. Id. at 1138 (noting that "[i]f McGregor had been ___ charged with drug activity on any other day during the preceding year, he would have received a sentence without enhancement."). In the present case, the district court found that Mitchell hired Wallace to burn the Club and instructed him how and when to do it. Clearly, these facts are distinguishable from the husband in McGregor who asks his wife to give buyers a package since he ________ would not be home to do it himself. As the McGregor court noted, ________ "[i]n the usual case, obtaining the services of a participant would make one a supervisor subject to an enhanced sentence." -33- Id. This is just such a usual case.14 ___ C. Obstruction of Justice C. Obstruction of Justice ______________________ The district court concluded that Mitchell obstructed justice through his use of his tape recordings to attempt to cover up the conspiracy to commit arson, finding that they were made in an effort to create a false record, and were "intended to mislead authorities investigating this case and to deceive the jury, indeed, a judge, should the matter develop to that point." (Sentencing hearing, at 45). The court accordingly increased the B.O.L. by two additional points. See U.S.S.G. 3C1.1.15 In ___ his brief, Mitchell does not contest the district court's factual findings. Instead, he makes three arguments designed to show that his use of the tapes did not rise to the level of obstruction required to apply this section. We address each in turn. First, Mitchell points out that the investigation was not obstructed in any manner, as the investigators did not know  ____________________ 14 Mitchell's point that he did not conduct other criminal activity in concert with Wallace is irrelevant: when weighing application of section 3B1.1(a), the sentencing court looks to the criminal activity charged. See, e.g., Balogun, 989 F.2d at ___ ____ _______ 23. 15 At the time of the offense that section stated: If the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense, increase the offense level . . . by 2 levels. U.S.S.G. 3C1.1 (1987). -34- of the tapes' existence until after his arrest. They were not misled by them in any way. See United States v. Manning, 955 ___ _____________ _______ F.2d 770 (1st Cir. 1992) (finding that giving false name to arresting officers did not amount to obstruction of justice under 3C1.1, as it did not mislead them). This argument is a red herring, however: the guideline itself provides that it applies if a defendant attempts to obstruct the administration of justice not only during the investigation, but also during the prosecution of an offense. Thus, whether or not the investigation was impacted by the tapes is irrelevant, since Mitchell used them at trial. Mitchell's second argument is that his use of the tapes did not thwart the administration of justice, since there was no intimidation of the witnesses, and no attempt to prevent them from testifying at trial. This, too, is a red herring, since intimidating or influencing a witness is not required in order to find obstruction of justice under section 3C1.1. Of course, it is one method that the commentary to that section notes may provide a basis for finding a defendant obstructed justice, see ___ U.S.S.G. 3C1.1 comment. (n. 1(d)), but the commentary's list is, by its terms, not exclusive. Finally, Mitchell argues that his use of the tapes does not qualify for an enhancement under section 3C1.1 because he did not use them as an affirmative weapon, since they were only used for impeachment purposes. The trial court's decision, he maintains, seeks to punish passive, defensive conduct designed to -35- protect the cross-examination process. However, as the Government points out, Mitchell's use of the tapes was not passive. He used portions of the February 1 and February 11 tapes to demonstrate his state of mind, and used the February 7 tape to cross-examine Wallace. Indeed, Mitchell does not challenge the district court's factual finding that the tapes were made in an attempt to create a false record, and we find no clear error in the court's finding. Given that, the court's application of section 3C1.1 was clearly proper. As the current commentary to that section notes, "producing or attempting to produce a false . . . record during a . . . judicial proceeding" rises to the level of obstructing justice. U.S.S.G. 3C1.1 comment. (n. 3(c)) (1995); see U.S.S.G. 3C1.1 comment. (n. 1(c)) (1987) ("producing or ___ attempting to produce an altered, forced, or counterfeit . . . record during a . . . trial" may be a basis for applying  3C1.1); see, e.g., United States v. Rojo-Alvarez, 944 F.2d 959, ___ ____ _____________ ____________ 969 (1st Cir. 1991) (finding that submission of altered passport as verification of defendant's identity met obstruction of justice standard); cf. United States v. Ruiz-Batista, 956 F.2d ___ ______________ ____________ 351, 353-54 (1st Cir.) (upholding use of sentencing guideline commentary added after date of offense where commentary clarified what conduct could be considered in determining defendant's role), cert. denied, 506 U.S. 834 (1992). As Mitchell produced a ____________ falsified record at trial, we uphold the district court's enhancement of his sentence for obstruction of justice. -36- VII. CONCLUSION VII. CONCLUSION For the reasons stated above, the decision of the district court is affirmed. affirmed ________ -37-